Beverly H. CONRAD, individually and on behalf of others similarly situated as Plaintiff/Class representative, Plaintiffs/Appellant,

v.

WAFFLE HOUSE, INC., Defendant/Respondent,

and

Shirley Enterprise, Defendant.

No. SD 30867.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 27, 2011.

Application for Transfer to Supreme Court Denied Oct. 19, 2011.

Application for Transfer Denied Dec. 6, 2011.

Anthony M. Pezzani, Chesterfield, MO, for Appellant.

Nancy M. Leonard and Megan K. Walawender, Kansas City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Presiding Judge.

Beverly H. Conrad ("Conrad") appeals the trial court's grant of Waffle House, Inc.'s ("Waffle House") motion for summary judgment. Finding no merit to Conrad's claim, we affirm.

## Factual and Procedural History

On March 26, 2007, Conrad filed suit—on behalf of a purported class of employ-

ees who received tips—against Waffle House, Shirley Enterprise[s, Inc.] ("SEI"), and Willis H. Shirley ("Shirley"),[1] alleging non-compliance with "Mo.Rev.Stat. §§ 290.512 and 290.502"[2] of the Missouri Minimum Wage Law ("MMWL").

■ On January 7, 1998, SEI entered into a "Franchise Agreement"[3] with Waffle House whereby Waffle House granted SEI "the exclusive right, license and privilege to use the System[4] and the Tradename [sic] in the establishment and operation of [a] Restaurant" located at 3135 N. Glenstone in Springfield, Missouri. This included purchasing or leasing, at its sole cost and expense, "all of the equipment deemed necessary to initially furnish the Restaurant for operation."

SEI and Waffle House also entered into a "Lease Agreement" wherein the parties expressly acknowledged that "the relationship between them is that of independent contractors, and not partners, joint venturers or principal/agent, and neither party is authorized to obligate or bind the other in any way, except as expressly authorized in this agreement." It also specified that all equipment, machinery, and fixtures were the sole property of SEI and could be removed at any time.

SEI retained Waffle House as its third-party vendor to perform accounting and related services, including payroll processing. During fiscal year 2007 (June 2006 through May 2007), SEI paid Waffle House the sum of $415 per restaurant, per operating period, to perform these accounting services. Only as a paid third-party payroll administrator did Waffle House agree to maintain SEI's "account and bookkeeping system for the [restaurant's] unit [information system ("UIS")] ... [and] maintain all bookkeeping and accounting records for [SEI] arising from the operation of the [restaurant][.]" Waffle House maintained no other records for SEI employees. SEI had the option of retaining independent accounting services with the only requirement being it had to provide Waffle House periodic financial information.

On May 7, 2006, Conrad was hired by SEI as a waitress and tipped employee to work at the North Glenstone location with a starting base rate of pay of $2.13 per hour. Both Conrad's W–2 and "Cash Receipt Statement" listed SEI as her employer. Both the employer federal tax identification number and the state tax identification number belonged to SEI.

In November 2006, Missouri voters approved Proposition B, which amended the MMWL, increasing the state minimum wage to $6.50 per hour. The amendment

---

1. On June 7, 2007, the trial court dismissed Willis H. Shirley from the lawsuit. Conrad elected not to appeal the trial court's dismissal ruling as to Shirley and instead elected to proceed solely against Waffle House.

2. All references to statutes are to RSMo Cum. Supp.2006, unless otherwise indicated.

3. Portions of various documents and deposition testimony referenced throughout this opinion were attached to Waffle House's motion for summary judgment and the responses thereto. The trial court grants or denies motions for summary judgment on the basis of what is contained in the motions for summary judgment and the responses thereto. *See* Rule 74.04(c). This Court is confined to considering the same information that the trial court considered in rendering its decision on the motion for summary judgment. *See ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

4. The "System" as used in the Franchise Agreement means a system owned by Waffle House, which is a "system ... for providing to the public fast food restaurant service of a[sic] unique and distinctive nature and style, associated with one or more tradenames [sic], servicesmarks [sic], or trademarks...."

also removed the exception to the coverage of the MMWL that had formerly exempted workers (including "tipped employees") who were covered by the federal Fair Labor Standards Act ("FLSA"). On December 11, 2006, the Missouri Department of Labor and Industrial Relations ("MODOL") announced its interpretation of the amendment stating that an employer subject to the FLSA would be required to pay tipped employees, as of January 1, 2007, "at least $2.13 per hour regardless of tips they receive" and "compensation for employees in this capacity must total at least $6.50 per hour."

On March 14, 2007, then-Governor, Matt Blunt, determined this was an incorrect interpretation of the amended MMWL and issued a directive to MODOL to comply with the MMWL and increase the "base wage for tipped employees to $3.25." Thereafter, MODOL announced that employers of tipped employees must now pay a minimum base wage of $3.25 per hour.

Waffle House in its capacity as payroll administrator for SEI conveyed MODOL's initial interpretation, and subsequent change in that interpretation, to Shirley. As president of SEI, Shirley was free to accept or reject the information he received from Waffle House. Due to the confusion caused by the amended MMWL, SEI continued to pay its employees a base wage of $2.13 until the issue was clarified. Following Governor Blunt's March 14, 2007 directive, SEI elected to increase its base wage to $3.25 and made the decision to pay back wages to its tipped employees for the time period of January 1, 2007 to approximately March 17, 2007, in the total amount of $6,122.71. Conrad pursued liquidated damages against Waffle House for the delay during which certain tipped employees of SEI were not paid $3.25 per hour in reliance on the MODOL's initial pronouncements.[5]

On October 31, 2007, Conrad gave notice to SEI and resigned her position. On April 17, 2009, the Master Agreement, Franchise Agreements, and Lease Agreements between Waffle House and SEI were terminated.

### *Conrad's Deposition Testimony*

Conrad testified she first came to believe Waffle House was her employer "when she walked in and the sign and everything on the place said Waffle House," including rules and regulations, menus, nametags, uniform shirts, and the *Waffle House Way* training manual. Conrad did acknowledge "[t]here's a plaque on the wall above the grill [at the restaurant] that says owned and operated by Shirley Enterprises" and admitted she "work[ed] for [Shirley's] company." Conrad also admitted she was interviewed and hired by SEI unit manager Glen Collins ("Collins") who reported directly to Shirley. She also admitted no one from Waffle House trained her and that she was trained by other SEI waitresses.

Conrad further admitted that Collins did the hiring and firing of employees, "wrote out the schedule," posted it, was the designated person to call with any schedule changes, and oversaw employee performance. Conrad also explained that Collins

---

5. Since SEI paid the back wages, at issue is whether Conrad is entitled to $258.49 in liquidated damages and whether Conrad's attorneys are entitled to attorneys' fees. On August 25, 2010, Conrad proceeded against SEI and obtained a default judgment against SEI totaling $54,316.74, comprised of $7,850.33 for the wage and hour claims in the Third Amended Petition, $44,825.00 in attorneys' fees, and $1,641.41 in costs. The $7,850.33 represents an award to Conrad and other members of the class, despite the fact that no other class members joined in the suit.

was the person who gave new employees the W–4 form and the Employment Eligibility Verification Form (I–9 form) to fill out as part of SEI's hiring process. Conrad acknowledged Collins did the wage calculations, sent them to Waffle House for processing, and gave employees their cash wages and pay stubs on Sundays after they signed SEI's "Cash Receipt Statement." Conrad testified Collins maintained employee personnel files in his office containing such things as applications for employment. Finally, Conrad acknowledged she never once contacted or spoke to anyone at Waffle House about anything concerning her employment and she never saw a Waffle House corporate employee in the restaurant.

### Shirley's Deposition Testimony

Shirley testified that he was an employee and part owner of SEI. Shirley understood from the Franchise Agreement that he was an independent contractor and Waffle House had no ownership interest in his restaurant. Shirley further testified he was responsible for hiring, firing, training, and paying his employees. Upon hiring, new employees were given a "training folder" containing the conduct policy, I–9 form, W–4 form, and the *Waffle House Way* training manual. Shirley stated that while Waffle House put the *Waffle House Way* training manual together, SEI had to purchase copies of the manual from a third-party vendor in order to provide it to employees. It was solely his decision whether or not to purchase the manual and provide it to new employees—it was not a Waffle House requirement. Shirley admitted SEI had an accounting service agreement with Waffle House for payroll purposes, but stated SEI had the option to retain an independent accounting service if it so chose.

Shirley testified Waffle House did not supervise or control SEI employee work schedules, daily activities or performance, and that his home phone number was the number posted as the "associate hotline" for employees to call with problems. Shirley explained that SEI employees were paid out of the SEI operating account; SEI paid all payroll taxes, which were reported under SEI's tax identification numbers; it was Shirley's decision as to the wage rate paid to SEI employees; and that the Waffle House accounting department relied on his UIS data to calculate SEI employee payroll. Shirley testified SEI paid for and maintained its own unemployment insurance account, premises insurance, and workers' compensation insurance. To Shirley's knowledge, Waffle House only retained SEI employee records pertaining to employee earnings history, I–9 forms (verified and processed by SEI), tax documents, and other payroll-related information.

Shirley also testified that in January 2007, he made the decision to continue paying SEI employees $2.13 per hour instead of $3.25 per hour pending clarification of the new MMWL. However, in March 2007, after MODOL changed its position and the Waffle House accounting department notified him of the change, it was his decision alone to pay SEI employees $3.25 per hour and pay them back wages for the prior ten weeks.

Shirley also testified that after the franchise agreement was terminated, he was unaware of what happened to the employees that were working at the locations operated by Shirley, and whether they were fired or rehired.

### Waffle House's Evidence

#### A. Affidavit of Kim S. Kraft

In an "Affidavit" [6] attested to and signed by Kim S. Kraft ("Kraft"), Chief Financial

Officer of Waffle House, Kraft stated Waffle House had no ownership interest in the restaurants owned and operated by SEI. Kraft also stated Waffle House and SEI did not have a fiduciary relationship, nor were Waffle House and SEI partners, joint venturers, agents or employees of the other. Waffle House considered SEI to be "an independent contractor responsible for all of its obligations and liabilities with respect to the establishment and operation of the restaurant." Kraft stated that Waffle House did not have the power to hire or fire SEI employees, did not supervise or control the work schedule or conditions of employment of SEI's employees, and did not determine the rate or method of payment for SEI employees. Kraft stated that Waffle House, only in its capacity as payroll administrator for SEI, maintained certain payroll records for SEI but did not maintain any personnel files or other records such as applications for employment, benefit information, leave records, attendance records, performance reviews, or any other personnel documents.

### B. Testimony of Tracy Bradshaw

Tracy Bradshaw ("Bradshaw"), Vice President of Franchise Services and Development for Waffle House, testified she ran the franchise accounting group which provided support to franchisees in a business consulting role. Bradshaw explained that a franchisee had the option of entering into an accounting service agreement with Waffle House whereby Waffle House would provide accounting services.

Bradshaw testified that the accounting department also monitored minimum wage changes and would make the necessary changes in the UIS and notify franchisees. It was then the individual franchisee's decision whether or not to pay the increase to its employees. Bradshaw admitted that the minimum wage change in January 2007 did cause some confusion as to how it affected the "cash minimum wage" and at the request of SEI, and several other franchisees, Waffle House's legal department made inquiries. It was determined that the new cash minimum wage should be increased from $2.13 to $3.25 and Bradshaw discussed this change with SEI through several emails. SEI made the decision to increase its cash minimum wage to $3.25 and to pay employees back wages from January 1, 2007 through March 14, 2007.

Bradshaw further testified that Waffle House had no role in who was hired, trained, terminated or fired as an employee at SEI. She acknowledged that Waffle House did create the *Waffle House Way* training manual as a standardized procedure for operating restaurants and to maintain consistency across the system, but that any training program for new employees was strictly at SEI's discretion. SEI had the choice of whether to order and use the *Waffle House Way* manual or use its own training materials.

Bradshaw also testified that Waffle House did not have a role in the scheduling, performance evaluations, or promotion decisions of SEI employees. Bradshaw stated that SEI determined its employee benefits, including vacations, paid compensation and rate of pay, and that this data

---

**6.** The Affidavit, and its exhibits, were designated as "Amended Documents Filed Under Seal" and filed with the Circuit Court of Greene County as exhibits to Waffle House's motion for summary judgment. The affidavit and exhibits were also sealed and filed separately with this Court and designated as "CONFIDENTIAL RECORDS TO BE OPENED BY MO COURT OF APPEALS ONLY."

was placed in the UIS by SEI management. Bradshaw further stated that all payroll processing done by Waffle House was dictated entirely by the financial and payroll information inputted daily into the UIS by the franchisee. This information was needed to support the payroll and accounting functions pursuant to the accounting services agreement. Bradshaw stated that other than an I–9 form (maintained for verification of employment eligibility only), a W–4 form, and various payroll-related printouts from the UIS, there were no other personnel-related documents maintained by Waffle House for SEI employees.

Finally, Bradshaw testified she believed Waffle House maintained a list of employees who had been terminated for cause, but that the list only existed due to the efforts of the franchisees who themselves inputted the data into the UIS. She testified it was strictly up to the franchisee whether or not to input termination information into the UIS. To her knowledge, the list was maintained in Georgia by Waffle House's legal department and was not circulated to franchisees. However, a franchisee could call and inquire whether a person was terminated for cause, but it was then the franchisee's decision whether or not to hire the person.

On March 31, 2009, Waffle House filed its motion for summary judgment. On October 27, 2009, the trial court granted Waffle House's motion for summary judgment finding "no genuine issue of material fact and that the moving party is entitled to Judgment as a matter of law." This appeal followed.

■■■ Conrad's single point relied on alleges the trial court erred in granting Waf-

fle House's motion for summary judgment and ruling as a matter of law that Waffle House was not Conrad's employer because Conrad presented sufficient evidence and disputed material facts to frame the issue of whether Waffle House was Conrad's employer and that the employer relationship between Waffle House and Conrad was a jury question.[7]

## Standard of Review

■■■ Appellate review of a grant of summary judgment is *de novo.* *Kinnaman–Carson v. Westport Ins. Corp.*, 283 S.W.3d 761, 764 (Mo. banc 2009). Summary judgment will be upheld on appeal if there is no genuine issue of material fact and movant is entitled to judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). "[A] genuine issue exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 382 (emphasis omitted). "Where the genuine issues raised by the non-movant are merely argumentative, imaginary or frivolous, summary judgment is proper." *Id.* (emphasis omitted). When the moving party is the defendant, summary judgment can be established by showing one of the following:

(1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support

---

7. Conrad's brief repeatedly references an alleged violation of the MMWL by virtue of a meal credit used by SEI. This allegation, how-

ever, was not raised by Conrad in her petition and is not properly before this Court.

the movant's properly-pleaded affirmative defense. *Id.* at 381.

■ "The Court reviews the record in the light most favorable to the party against whom summary judgment was entered." *Kinnaman–Carson*, 283 S.W.3d at 764. " 'The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially.' " *Id.* (quoting *ITT Commercial Fin.*, 854 S.W.2d at 376). Summary judgment is an extreme and drastic remedy and we exercise great caution in affirming it because the procedure cuts off the opposing party's day in court. *ITT Commercial Fin.*, 854 S.W.2d at 377.

## Analysis

■ Conrad contends that there was "sufficient evidence and disputed material issues of fact" as to whether Waffle House was Conrad's employer under section 290.500 *et seq.* We, however, find Waffle House demonstrated there is no genuine issue of material fact and the undisputed facts show Conrad was not a Waffle House employee, negating one of Conrad's elements.

In *Fields v. Advanced Health Care Mgmt. Services, LLC,* 340 S.W.3d 648 (Mo. App. S.D.2011), this Court found the economic realities test appropriate for determining whether an employment relationship exists under the MMWL. Thus, in determining whether Waffle House proved there was no employment relationship, we consider the following four factors: "(1) who has the power to hire and fire the worker; (2) who supervises and controls the worker's work schedule and conditions of work; (3) who determines the rate and method of payment of the worker; and (4) who maintains work records." *Id.* at 654

(citing *Baker v. Stone County, Missouri,* 41 F.Supp.2d 965, 981 (W.D.Mo.1999)). *Fields* additionally adopted a fifth factor it deemed appropriate to its analysis—whose premises and equipment are used in performing work—which we also apply here. 340 S.W.3d at 654. "In applying this test, courts look to different factors with no one factor being dispositive and no single set of factors being exhaustive." *Id.* "[T]he factors are not applied mechanically, but must be considered in the context of the economic realities and circumstances of the whole work relationship." *Id.* (emphasis omitted).

First, evidence established that Waffle House had no authority to hire or fire Conrad during this period. This included Conrad's admission that Collins did the hiring and firing of employees; Bradshaw's further testimony that Waffle House had no role in who was hired, trained, terminated or fired as an employee at SEI; and Kraft's affidavit stating that Waffle House did not have the power to hire or fire SEI employees.

■ In support, Conrad presents conjecture, assumptions, and speculation regarding "Waffle House [taking] over the operations of the Franchisee's store without disruption to the business." Significantly, this alleged event occurred *after* SEI defaulted and the Franchise Agreement between SEI and Waffle House was severed, which was eighteen months after Conrad quit her job and two years after the pay actions in question. Further, the only evidence cited by Conrad is Shirley's testimony that he did not know what happened to the employees after the termination of the Franchise Agreement. Therefore, the alleged fact that Waffle House took over operations without disruption is irrelevant to the case before us and unsupported by admissible evidence. " 'Only evidentiary materials that are ad-

missible or usable at trial can sustain or avoid summary judgment'" *L.A.C ex rel. D.C. v. Ward Parkway Shopping Center Co., L.P.,* 75 S.W.3d 247, 253 n. 3 (Mo. banc 2002) (quoting *Partney v. Reed,* 889 S.W.2d 896, 901 (Mo.App. S.D.1994)).

Conrad's contention that because Waffle House kept a copy of her I–9 form it had the authority to hire or fire her, is an unsupported conclusion and refuted by the above evidence. Notably, Shirley admitted that SEI, not Waffle House, verified the eligibility by completing the I–9 form with information from the employee's identification, such as a driver's license and Social Security card. Waffle House's maintenance of an I–9 form is consistent with the payroll services it provided to SEI. This Court in *Fields,* highlighted the distinction between the authority to hire and fire employees and merely providing payroll and human resource services. *See Fields,* 340 S.W.3d at 655. Conrad also points to Waffle House's maintenance of a "no hire" database. Conrad's recitation of this fact is misleading and does not support Conrad's contention. In fact, Conrad conveniently omits the testimony that although franchisees could call and inquire whether someone was on the list, it was strictly within the franchisee's decision whether or not to hire that person. Thus, the first factor clearly compels a conclusion that Conrad was not Waffle House's employee.

In examining the next factor, we find undisputed evidence supports Waffle House did not supervise and control Conrad's work schedule or conditions of employment. Conrad testified Collins "wrote out the schedule," posted it, was the designated person to call with any schedule changes, and oversaw employee performance. Conrad acknowledged she never contacted or spoke to anyone at Waffle House about anything concerning her em-

ployment. Similarly, Shirley testified that Waffle House did not oversee the performance of SEI employees, control their daily activities, or set their schedules.

To refute this evidence, Conrad points to the fact that Waffle House took control of the restaurant after SEI and Shirley defaulted and the Franchise Agreement was severed. As discussed above, this has no bearing on these facts. Waffle House's ability to terminate the Franchise Agreement does not indicate Waffle House had the ability to supervise and control Conrad's employment, especially in light of the fact this event occurred a year-and-a-half after Conrad resigned from Waffle House.

 Conrad also points to the *Waffle House Way* manual and contends it "establishes that [Waffle House] was intimately involved in every aspect of Conrad's employment, including her appearance, approach with customers, shift responsibilities, training and uniform." This is a misguided conclusion. A franchisor does have a legitimate interest in retaining some degree of control in order to protect the integrity of its marks; however, the existence of those requirements does not necessarily mean a franchisor has a role in supervising and controlling an employee's work schedule or conditions of employment to qualify the franchisor as a statutory employer. In fact, various courts considering the economic realties test have found that when a franchisor retains certain rights—such as the right to enforce standards, the right to terminate the agreement for failure to meet standards, the right to inspect the premises, the right to require that franchisees undergo certain training, or the mere making of suggestions and recommendations—along with actions taken to enforce those rights, did not amount to sufficient control to subject the franchisor to liability for fran-

chisee's actions.[8] Here, Waffle House put the *Waffle House Way* training manual together, but SEI had to purchase it from a third-party vendor. Significantly, using the manual was solely at SEI's discretion and was not a Waffle House requirement. The *Waffle House Way* manual cannot be said to give Waffle House sufficient control over Conrad's work schedule and conditions to establish Waffle House was Conrad's statutory employer, especially in light of Conrad's testimony regarding the clear control SEI exercised over her work conditions. Thus, even viewing the facts in the light most favorable to Conrad, there is no basis for finding that Waffle House controlled Conrad's employment based on this factor.

Third, we consider whether Waffle House determined Conrad's rate and method of pay. The evidence established that Waffle House acted solely as a payroll service provider and it did not determine Conrad's rate and method of pay. Shirley specifically testified that he decided to change his employees' rate of pay after Bradshaw informed him of the new wage rate, but that it was strictly his decision. Thus, Conrad's contention that her rate and method of pay was determined by Waffle House when it informed its franchisees of MODOL's March 14, 2007 change in position as to tipped employees, is with-

out support. Accordingly, the third factor weighs heavily that Waffle House was not Conrad's employer.

The fourth factor—who maintains work records—also supports the finding that Waffle House was not Conrad's employer. Conrad argues that by maintaining certain documents related to the payroll services, Waffle House maintained Conrad's employment records; we disagree. Here, the only documents related to Conrad that were retained by Waffle House were those related to payroll functions Waffle House provided to SEI, including I-9 forms. Conrad's W-2 did not list Waffle House as its employer; rather, SEI was identified as Conrad's employer and SEI's state and federal identification numbers were used. Waffle House did not maintain personal documents, prior employment information, benefit information, personnel files, leave and attendance records, or performance reviews. Accordingly, this factor, considering the circumstances as a whole, also does not support Waffle House was Conrad's employer.

The fifth factor adopted by this Court in *Fields*, is the use of premises and equipment in performing work. 340 S.W.3d at 655. Here, the record establishes that the premises were controlled by SEI and the equipment belonged to SEI. The Lease Agreement specified that SEI was the les-

---

**8.** While out-of-state appellate decisions do not constitute controlling precedent in Missouri courts, they may be persuasive when the facts are similar, and when they are based on sound principles and good reason. *Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 380 (Mo.App. E.D.2005). We find the following cases involving grants of summary judgments for the franchisor instructive for those reasons: *Singh v. 7–Eleven, Inc.*, No. 05–4534, 2007 WL 715488, *5 (N.D.Cal. Mar. 8, 2007) (rejecting the argument that franchisor 7–Eleven effectively controlled the conditions of employment because it set the store hours, had "total control" over the delivery of service by employees, had control over the food service standards, and the uniforms to be worn); *Hong Wu v. Dunkin' Donuts, Inc.*, 105 F.Supp.2d 83, 88 (E.D.N.Y.2000) (noting franchisor's right to inspect and enforce standards not sufficient to establish control); *Helmchen v. White Hen Pantry, Inc.*, 685 N.E.2d 180, 182 (Ind.App.Ct.1997) (finding franchisor's right to make suggestions and recommendations and to terminate franchise agreement for noncompliance was insufficient to establish control); *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 814 (Iowa 1994) (issuing and requiring franchisee to comply with standards manual not sufficient control).

see responsible for the upkeep of the premises and was to maintain appropriate insurance coverage. SEI also had the duty to repair in case of damage to the building by fire or other events. Additionally, the Lease Agreement set out that the fixtures and equipment within the restaurant were specifically owned by SEI and remained SEI's personal property. Likewise, the Franchise Agreement required SEI to purchase or lease the equipment used in its restaurant and, it was only upon termination of the Franchise Agreement, that Waffle House had the option to purchase all of the fixtures, furniture, and equipment owned by SEI and used in the restaurant. Additionally, Conrad testified, "There's a plaque on the wall above the grill that says owned and operated by Shirley Enterprises." Shirley also testified that he owned and operated the restaurant at which Conrad worked and that Waffle House had no ownership interest in the restaurant. As such, there is no evidence that supports this factor weighs in favor of Conrad.

In applying the economic realities test, based on the undisputed facts, all five factors support Waffle House's position that it was not Conrad's employer and we do not find any evidence or the existence of issues of material facts that would allow for a jury to decide otherwise. Thus, Waffle House has negated an essential element of Conrad's claim and is entitled to summary judgment. Point denied.

The trial court's judgment is affirmed.

BARNEY and SCOTT, JJ., Concur.