Douglas L. COVERDELL and Annette R. Coverdell, Appellants,

v.

COUNTRYWIDE HOME LOANS, INC., Respondent,

and

Patsy J. Gross, Defendant.

No. SD 31649.

Missouri Court of Appeals, Southern District, Division One.

Aug. 24, 2012.

Robert W. Cockerham, St. Louis, MO, for appellant.

Rhiana A. Luaders, St. Louis, MO, for respondent.

WILLIAM W. FRANCIS, JR., J.

Douglas L. Coverdell ("Douglas")[1] and Annette R. Coverdell (collectively "the Coverdells") filed suit against Countrywide Home Loans, Inc. ("Countrywide"), and Patsy J. Gross ("Gross") alleging breach of contract and tortious interference against both parties, as well as negligent misrepresentation and fraudulent misrepresentation against Countrywide. The trial court granted Countrywide's motion for summary judgment and the trial court dismissed all counts in the Coverdells' first amended petition.[2] This appeal followed. We affirm the decision of the trial court.

### Factual and Procedural Background

The record reveals Gross owned a piece of real property ("the Property") located on Highway JJ in Blue Eye, Missouri. Countrywide "service[d] [the] loan secured by a Deed of Trust" on the Property and when Gross was "unable to meet her loan obligations on the Property[,]" Countrywide sent her a "NOTICE OF DEFAULT AND ACCELERATION." On September 26, 2005, Countrywide ordered an appraisal of the Property. The appraisal was completed on October 19, 2005, and the estimated value of the Property was $232,000.[3]

In late October 2005, Gross listed the Property for sale with realtor Loann Barter ("Barter"), who understood from Gross that the listing price "was going to be significantly less than the amounts of the two mortgages" such that Gross "was going to get no equity and that the lenders were being asked to take a significant loss[.]" Gross specifically stated in the real estate listing disclosure that she was "working with the lender regarding this sale" and the listing itself included the caveat that realtors should "include the language that makes your offer contingent upon acceptance by [Gross's] mortgage company." The listing price on the Property was $239,900.

On December 3, 2005, the Coverdells, via their agent Patty Silliman ("Silliman"), submitted a "Contract for Sale of Residential Real Estate" offering to pay the full listing price for the Property with no contingencies and closing to be set for February 15, 2006. The Coverdells' offer included the phrase "BUYER UNDERSTANDS THAT THIS OFFER IS MADE CONTINGENT ON THE SELLER'S MORTGAGE COMPANY ACCEPTING THIS CONTRACT." Gross rejected this initial offer and countered—not by changing the sale price—but by adding the language "offer is contingent upon seller and mort-

---

1. For clarity and ease of analysis we have chosen to refer to some of the parties in this matter by their first names. We mean no disrespect in so doing.

2. The record reveals the Coverdells failed to serve Gross with a copy of the First Amended Petition and it appears she did not participate in any manner below. Accordingly, while the trial court dismissed the counts against Countrywide with prejudice, the trial court dismissed Counts I and III against Gross without prejudice. Further, as this appeal focuses on the counts asserted solely against Countrywide, we shall only focus on those counts in this opinion.

3. Gross apparently owed $320,000 on the first deed of trust, and $52,600 on the second deed of trust.

gage company agreeing to all aspects of this sale." This counter-offer was accepted by the Coverdells on December 8, 2005. Both the offer and counter-offer explicitly stated that the written documents constituted the entire agreement between the parties and "[t]here are no other understandings, written or oral, relating to the subject matter hereof."

On December 12, 2005, four days after completing the sales contract with Gross, the Coverdells entered into a contract to sell the Property to Ronald Zumalt ("Zumalt")[4] for $900,000 in anticipation of a condominium development that they expected would turn a profit of over ten million dollars. They also entered into agreements with other parties relating to the development of the Property.

On January 16, 2006, Gross entered into a "NEGOTIATION AGREEMENT" with Countrywide. Among other things, this document stated that it would "constitute a binding agreement ... between [Gross] and Countrywide concerning Countrywide's workout discussions with [Gross]"; that Countrywide was "acting on behalf of the holder of [the] loan (the investor) and the mortgage and/or pool insurers" such that any information Countrywide "provides ... is on their behalf"; that "until a written document is signed by the appropriate parties specifically superseding and replacing all or some of the Loan Documents[,]" they would remain in full force and effect; that neither party would be "bound by any workout agreement concerning [the] Loan until such agreement has been put in writing, is signed by each [party] and is returned to Countrywide"; and that it "constitute[d][the] entire agreement relating to the ongoing or contem-

plated discussions identified herein ... [.]" There were no details, specific "workout" plans, or proposed solutions to Gross's default situation set out in the Negotiation Agreement.

On January 18, 2006, the Coverdells deposited $1,000 in earnest money with Tri–Lakes Title and Escrow relating to the transaction with Gross. Just prior to the stated February 15, 2006 closing date, anticipated in the sales contract, Barter was contacted by Countrywide and told Countrywide "was not going to" agree to the terms of the sales contract. Barter contacted Silliman and told her that the "contact person at Countrywide" had advised that the sales contract between Gross and the Coverdells would "not be allowed to be consummated" because the " 'committee' had turned down the offer ..." Barter was told by Countrywide that the Property would be "put back on the market at a later date, at a higher price" as they had been advised the area was in a " 'slow market' " such that it "would bring a higher price in the spring." Accordingly, the transaction between Gross and the Coverdells did not close.

The Coverdells filed their initial petition in this matter on January 16, 2007, and a "FIRST AMENDED PETITION" was filed on January 15, 2010. In the second count of their amended petition, the Coverdells alleged they were "direct, intended beneficiaries of [an] agreement between [Gross] and Countrywide" which provided Gross "would sell the ... [P]roperty upon receipt of approval from [Countrywide] and [Countrywide] would be entitled to all proceeds from the sale of the ... [P]roperty and would release [Gross] from her mortgage obligations." They asserted

---

4. We note the Contract for Sale between the Coverdells and Ronald Zumalt shows Zumalt spelled "Zumwalt." Because the entire record on appeal, as well as all the briefs, refer to "Zumalt" that is the spelling we have adopted throughout this opinion. There is no indication in the record as to the correct spelling.

Countrywide then "breached its agreement with [Gross] when, without just cause or excuse, [it] rescinded its approval of the sale of the . . . [P]roperty" such that the Coverdells were damaged in an amount not less than $5,000,000. In Count IV for tortious interference, the Coverdells asserted Countrywide knew about their contract with Zumalt and that it "intentionally, and without justification or excuse, interfered with said contracts causing [Gross] to breach her contract with [the Coverdells] and [the Coverdells] to breach their contracts with [Zumalt and others]" such that they were damaged in an amount not less than $5,000,000. In Count V for negligent misrepresentation, the Coverdells maintained Countrywide "represented that it approved the sale of the . . . [P]roperty"; that it "failed to exercise reasonable care, and as a result the representation was false"; that Countrywide "intentionally provided the representation for [the Coverdells'] guidance in the business transaction [with Gross]"; and that the Coverdells "justifiably relied upon [Countrywide's] representation" such that they were damaged. Likewise, in Count VI for fraudulent misrepresentation, the Coverdells asserted Countrywide "represented that it approved the sale of the . . . [P]roperty . . . intending that [the Coverdells] rely upon such representation"; that the representation was false and Countrywide "knew that it was false or made the representation without knowledge as to its truth or falsity"; that the representation was "material" to the Coverdells' decision to enter into the contract with Zumalt; and that as a result of their reliance on Countrywide's representation, the Coverdells were damaged.

On May 31, 2011, Countrywide filed a motion for summary judgment in which it essentially asserted the facts were undisputed that there was no direct contact between Countryside and the Coverdells,

there were no facts asserted to prove the Coverdells were intended or third-party beneficiaries to any contract that Countrywide and Gross were parties to, and there were no facts asserted in the first amended petition that any representations were made by Countrywide to the Coverdells upon which they could reasonably rely. In their response, the Coverdells stated, among other things, that there were facts in dispute in that Countrywide did approve the sale from Gross to the Coverdells; they were, in fact, intended third-party beneficiaries to a contract between Gross and Countrywide; and Countrywide did have knowledge of the Coverdells' contracts with Zumalt and others relating to the Property.

Following a hearing, the trial court ruled as to Count II, breach of contract, that "the only written agreement presented to the court between [Gross] and [Countrywide] is the two[-]page Negotiation Agreement dated January 16, 2006[,]" and there is "nothing in the Negotiation Agreement to indicate its provisions were to benefit any third party or third parties except 'the holder of [the] loan (the investor) and the mortgage and/or pool insurers.' " In discussing this count, the trial court noted the "problem with [the Coverdells'] argument is that there is no admissible evidence before the court to prove that Countrywide approved the 'short sale' [of the Property from Gross to the Coverdells] under the Negotiation Agreement" such that the Coverdells' contention that they were third-party beneficiaries failed. As to Count IV, tortious interference, the trial court pointed out that "after over a year and a half of time for additional discovery, [the Coverdells] still rely on the testimony of Patrick McNeive [ ("McNeive"), the Coverdells' banker who testified that he spoke with a Countrywide representative,] to prove Countrywide had

knowledge of [the contracts between the Coverdells and Zumalt]." The trial court found that this testimony from McNeive "regarding an unknown person who called on the telephone, that he believed him to be a representative of Countrywide ... is an expression of a conclusion based on hearsay, which would appear to clearly be inadmissible." It further noted that "in his deposition testimony, [Douglas] admits that he never had any contact with Countrywide or ... [Gross], and he did not show the two agreements [with Zumalt] to anyone, except perhaps his banker." As to Counts V and VI, negligent and fraudulent misrepresentation, the trial court pointed out that Silliman specifically testified that as of January 16 or 17, 2006, they "didn't have a contract [relating to the Property], all of [them] understood that, until the mortgage company had agreed and let [Barter] know they had accepted it" such that the Coverdells' allegation that they relied on Countrywide's approval for the transaction, which occurred in early December 2005, was insufficient to prove their counts for misrepresentation. Ultimately, the trial court found the Coverdells' response to Countrywide's motion for summary judgment did not provide the trial court

with sufficient admissible evidence that a genuine issue of material fact exists in support of their assertions that [Gross] and [Countrywide] entered into any agreement except the Negotiation Letter, ... or that [the Coverdells] were beneficiaries of any agreement with

Countrywide, or that Countrywide unlawfully interfered with the proposed sale from [Gross] to [the Coverdells], or that Countrywide was aware of the contracts [between the Coverdells and others to sell the Property], or that Countrywide made representations upon which [the Coverdells] relied in entering into their contracts regarding the [P]roperty. Accordingly, the Motion for Summary Judgment of [Countrywide] is sustained.

This appeal followed.

■ At issue here is the Coverdells' assertion that the trial court erred in granting Countrywide's motion for summary judgment and "dismissing Counts II, IV, V and VI of their first amended petition...." They maintain there was error in that they presented sufficient admissible evidence to demonstrate "a genuine issue of material fact in regard to the issues of whether [they] are third-party beneficiaries, whether Countrywide knew about [their] plans with the Property and interfered therewith and whether Countrywide could obtain summary judgment on [their] misrepresentation claims." [5]

### Standard of Review

Appellate review of a grant of summary judgment is *de novo. Kinnaman–Carson v. Westport Ins. Corp.*, 283 S.W.3d 761, 764 (Mo. banc 2009). As our review is *de novo*, if the trial court's judgment can be sustained on any ground as a matter of

5. The Coverdells' point relied on violates Rule 84.04(d) because it joins multiple, unrelated contentions. *Mello v. Williams*, 73 S.W.3d 681, 685 (Mo.App. E.D.2002). Thus, it is improperly multifarious in that it contains multiple legal issues, which should be stated in separate points. *See Thummel v. King*, 570 S.W.2d 679, 688 (Mo. banc 1978) (holding it is "fundamental error" in briefing to group numerous incidents of error into "one point

or one allegation of error" where the incidents of error do not relate to a single issue). While Countrywide urges that we dismiss the entirety of the Coverdells' appeal based on this and other briefing deficiencies, as we can discern their contentions, we shall address the Coverdells' point *ex gratia*.

All rule references are to Missouri Court Rules (2011).

law, even if different than the one posited in the order granting summary judgment, it should be affirmed. *ITT Comm'l Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 387–88 (Mo. banc 1993). Summary judgment will be upheld on appeal if there is no genuine issue of material fact and movant is entitled to judgment as a matter of law. *Id.* at 380. When the moving party is the defendant, a prima facie case for summary judgment can be established by showing one of the following:

> (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.* at 381 (emphasis in original); Rule 74.04(c)(6). "Facts that are set forth by affidavit in support of a party's motion for summary judgment are taken as true unless contradicted by the non-moving party's response to the motion." *First Nat. Bank of St. Louis v. Ricon, Inc.*, 311 S.W.3d 857, 866 (Mo.App. E.D.2010). "When ... the movant has made the prima facie showing required by Rule 74.04(c), Rule 74.04(e) places burdens on

the non-movant." *ITT Comm'l Fin.*, 854 S.W.2d at 381.

This Court reviews the record in the light most favorable to the party against whom judgment was entered and that party is accorded the benefit of all reasonable inferences from the record. *Kinnaman–Carson*, 283 S.W.3d at 764. " 'The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially.' " *Id.* (quoting *ITT Comm'l Fin.*, 854 S.W.2d at 376). Summary judgment is an extreme and drastic remedy and we exercise great caution in affirming it because the procedure cuts off the opposing party's day in court. *ITT Comm'l Fin.*, 854 S.W.2d at 377.

### Analysis

As the trial court's decision disposed of four separate counts in the Coverdells' first amended petition against Countrywide, we shall address them individually in order to analyze the propriety of the grant of summary judgment as to each count.

### Count II: Breach of Contract

 We turn first to the Coverdells' count for breach of contract. In order to prove their breach-of-contract count, the Coverdells were necessarily required to prove they were intended or third-party beneficiaries to a contract.[6] *See Verni v. Cleveland Chiropractic College*, 212

---

**6.** As explained in *Kansas City Hispanic Ass'n Contractors Enterprise, Inc. v. City of Kansas City*, 279 S.W.3d 551, 555 (Mo.App. W.D. 2009),

> [a] third-party beneficiary is one who is not privy to a contract but *may* nonetheless pursue a cause of action for breach of contract. The rights of a third-party beneficiary depend on the terms of the contract itself. The beneficiary need not be named in the contract, but the terms of the agree-

ment must clearly and directly express an intent to benefit an identifiable person or class. A party claiming rights as a third-party beneficiary has the burden of showing that provisions in the contract were intended for his direct benefit. The contract rights are only enforceable if the promissor assumed a direct obligation to the third-party beneficiary.

(Internal quotations and citations omitted) (emphasis in original).

S.W.3d 150, 153 (Mo. banc 2007) (holding that in a breach of contract action "[o]nly parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract.").

In support of their count for breach of contract, the Coverdells urged in their first amended petition and in their response to the motion for summary judgment, that they were third-party beneficiaries to the Negotiation Agreement entered into by Countrywide and Gross, which was essentially a letter between those two parties in which they agreed to make an effort to "workout" the situation caused by Gross's default. The Negotiation Agreement did not mention the Coverdells. Further, it specifically stated Countrywide was only "acting on behalf of the holder of [the] loan (the investor) and the mortgage and/or pool insurers" and not on behalf of any future potential purchasers or other persons. It clearly stated that neither Gross, nor Countrywide, would be "bound by any workout agreement concerning [the] Loan until such agreement has been put in writing, is signed by each [party] and is returned to Countrywide[,]" and there was no evidence produced that this was ever done. It further specifically set out that "unless and until a written document is signed by the appropriate parties[,]" the original loan documents and deeds of trust, and their attendant provisions, would remain in effect.

The Negotiation Agreement is the only written document relied upon by the Coverdells and it contains no provisions approving a "short sale" from Gross to the Coverdells. In fact, it does not even mention a sale of the Property at all. The Coverdells do not point to a single line in this document which supports their assertion that it was a binding contract to do anything but allow Countrywide and Gross to engage in "ongoing or contemplated dis-

cussions[.]" Regardless of the fact that the Negotiation Agreement does not mention a "short sale" and does not refer to any potential sale or future purchasers, the Coverdells urge in their brief, without citation to relevant authority, that "[w]hile not specifically named in the agreement," they "were within the class of persons (*i.e.* purchasers), which would primarily benefit from the short sale agreement." The Negotiation Agreement clearly addresses Gross's desire to negotiate with Countrywide in order to address her default on the deeds of trust securing the Property. It in no way relates to any anticipated future transactions by Gross and it in no way relates to the Coverdells. Their argument that they are intended or third-party beneficiaries to the "agreement" between Countrywide, the servicer of the loan, and Gross, the borrower facing foreclosure, is not supported by any facts and is contrary to the law. The Coverdells failed to produce any admissible evidence to rebut Countrywide's motion for summary judgment. The Coverdells failed to demonstrate there was any genuine issue of fact that they were not third-party beneficiaries of the Negotiation Agreement and, thus, the trial court was correct in granting summary judgment in favor of Countrywide.

### Count IV: Tortious Interference

■ Next, we examine the Coverdells' count for tortious interference. A claim for tortious interference with a contract requires proof of the following five elements: " '(1) a contract ...; (2) defendant's knowledge of the contract or relationship; (3) an intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages.' " *Environmental Energy Partners, Inc. v. Siemens Bldg. Tech., Inc.*, 178 S.W.3d 691, 697 (Mo.App. S.D.2005) (quoting *Birdsong*

*v. Bydalek,* 953 S.W.2d 103, 111 (Mo.App. S.D.1997)).

 Here, Countrywide asserted in its motion for summary judgment that "[t]here is no admissible evidence that Countrywide had knowledge of" the Coverdells' agreement to immediately re-sell the Property to Zumalt such that the Coverdells could not prove their tortious-interference theory. In support of its assertion, Countrywide pointed out that in previously filed answers to interrogatories the Coverdells, when asked what facts show "knowledge by [Countrywide] of the existence of a contract or relationship between [the Coverdells] and any bona fide purchaser of the Property[,]" the following response was given:

> [Countrywide] was well aware of the contract between [the Coverdells] and [Gross], as [Countrywide] accepted and approved the contract between these parties. [The Coverdells] have produced the contracts between [the Cover-

dells] and other bona fide purchasers of the Property.

In addition, in late January 2006, a representative from [Countrywide] or a bank associated with Countrywide, contacted [McNeive], then Executive Vice President of Community Bank of the Ozarks, and inquired about [the Coverdells'] ability to close the contract on the Property. During this conversation, [McNeive] told the representative that [Douglas] had already sold the property to [Zumalt] and that [Douglas and others] were going to build a condo development. [7]

Countrywide further pointed out that Barter had stated in her deposition testimony she did not know of the Coverdells' contracts with Zumalt or their intention of "flipping" the Property; Douglas admitted in his deposition that he never had personal dealings with Countrywide, he did not send or receive anything to or from Coun-

---

7. Attached to the interrogatory answer were the following relevant portions of an affidavit from McNeive:

> 6. I have worked continuously with [Douglas], as his banker, since approximately 1998.
>
> 7. In late January 2006, I was working as Executive Vice President of Community Bank of the Ozarks ... when I received a phone call from a man calling on behalf of [Countrywide] or a bank associated with Countrywide, asking if [Douglas] had the funds available at our bank to close on a contract.
>
> 8. At first I believed the man was inquiring about the Skyline property, and I told the man that [Douglas] had the funds to close on the Skyline property.
>
> 9. When I made that comment, the man asked if [Douglas] was purchasing more than one piece of property from Countrywide.
>
> 10. I asked which property the man was referring to, and he replied 'the house on JJ Highway on Tablerock Lake' to which I replied 'Oh, the house [Douglas] is selling to [Zumalt].'

> 11. The man then asked if [Douglas] had already sold the property on JJ Highway, and I asked if he was verifying funds for [Douglas] or [Zumalt].
>
> 12. The man replied that he was verifying funds for [Douglas], and I informed him that [Douglas] had the funds available at our bank to close the contract on the [Property].
>
> 13. After informing him that [Douglas] had the funds to close, the man remarked 'if he's already got it sold to someone else, it must be worth more than he's paying for it.'
>
> 14. I told the man that I think it's worth more than he is paying for it and that [Douglas and others] were planning on doing a big condo project down on that property, and then I asked if Countrywide would be the bank financing the condo project and if that was the reason for the phone call.
>
> 15. At this point in the conversation, the man excused himself and told me he would call me back, but he never did.

trywide, he never had any direct contact with Barter, and he was not aware Countryside was even involved in the transaction until 2006; the Coverdells admitted they did not show or provide Gross or Countrywide with information relating to the transaction with Zumalt prior to this matter being initiated; and there was never approval by Countrywide relating to the sale of the Property from Gross to the Coverdells. Based on the foregoing uncontroverted facts, Countrywide argued the Coverdells could not prove the third-party beneficiary theory underlying their claims and could not prove that Countrywide had notice of the Zumalt contract such that it was entitled to judgment as a matter of law.

In their response to Countrywide's motion for summary judgment and statement of uncontroverted facts, the Coverdells asserted "Countrywide knew about [their] subsequent contracts [to sell the Property] when a representative on their behalf contacted a banker[,] [McNeive,] involved with [Douglas's] purchase of a different property." In support of this assertion, in addition to citing the aforementioned affidavit of McNeive, the Coverdells pointed to the deposition testimony of McNeive taken in May 2011. In his deposition, McNeive admitted that, while he was certain the caller was a male, he did not know the name of the person who called him; he could not identify or describe the caller's employer; he did not know the phone number of the caller; he was unsure of the title or position of the caller; he did not know where the caller was phoning from; he did not know how the caller knew to phone the branch of the bank where he was working; he could not give the approximate age or ethnicity of the caller;

and he could not determine what, if any, expertise the caller may have had in the banking field.[8] Most importantly, he was unable to testify who the caller was representing:

[Counsel for Countrywide]: Did the man say that he was calling on behalf of one or more organizations?

[McNeive]: No.

[Counsel for Countrywide]: Did he say he was calling on behalf of just one organization?

[McNeive]: He said one organization; and to the best of my ability, I remember it being Countrywide Homes or a bank associated with Countrywide. I do not know his—that's why I worded it that way [in the affidavit]. I cannot tell you specifically who he represented.

[Counsel for Countrywide]: So if I'm reading your affidavit correctly, the man didn't use the words I'm calling on behalf of a bank associated with Countrywide?

[McNeive]: Correct. Those are my words.

[Counsel for Countrywide]: Those were not the words that this man used in the phone call?

[McNeive]: Yeah, I didn't put them in quotes. This is my recollection of the facts of the situation, no one else's.

[Counsel for Countrywide]: And as you sit here today and at the time you prepared your affidavit, you just cannot identify which one was the one organization that he was calling on behalf of?

[McNeive]: Correct.

Further, in support of their response to Countrywide's statement of uncontroverted facts, the Coverdells cited to a specific

8. The Coverdells admitted the aforementioned information in their statement of uncontro-

verted facts.

page of the deposition of McNeive which contained the following colloquy:

> [Counsel for Coverdells]: And I think you covered this earlier, but I think you talked about after you had your conversation with that man from Countrywide—
>
> [Counsel for Countrywide]: I'm going to object to the form. He said he couldn't identify him as an employee of Countrywide. He said he called on behalf of.
>
> [Counsel for he Coverdells]: As a representative of Countrywide—
>
> [Counsel for Countrywide]: He said he called on behalf of.
>
> [Counsel for he Coverdells]: The gentleman that you talked to that was calling on behalf of Countrywide that, through your conversations with him, you believe him to be a representative of Countrywide; correct?
>
> [McNeive]: Yes, and that's what I stated previously.

According to the Coverdells, the aforementioned testimony from McNeive proved the caller "was acting as an agent and representative of Countrywide[,]" such that Countrywide was put on notice of their transaction with Zumalt.

 Again, as with Count II, the Coverdells have failed to produce any admissible evidence to rebut the assertions in Countrywide's motion for summary judgment. The only evidence cited in support of their assertion that Countrywide had knowledge of their transactions with Zumalt is McNeive's affidavit and deposition testimony relating to a conversation he had with some unknown person who purportedly was a representative of Countrywide. This is clearly hearsay. When a witness offers the out-of-court statements of another person to prove the truth of the matter asserted in the statement, then the testimony is hearsay. *Bynote v. Nat'l Su-*

*per Markets, Inc.,* 891 S.W.2d 117, 120 (Mo. banc 1995). "Hearsay statements cannot be considered in ruling on the propriety of summary judgment." *United Petroleum Service, Inc. v. Piatchek,* 218 S.W.3d 477, 481 (Mo.App. E.D.2007). Only evidence that is admissible at trial can be used to sustain or avoid summary judgment. *Conrad v. Waffle House, Inc.,* 351 S.W.3d 813, 820–21 (Mo.App. S.D. 2011). McNeive's statements as to what this unknown person said to him are hearsay and would be inadmissible at trial. The Coverdells did not rebut the *presumptions* set out in Countrywide's motion for summary judgment such that the trial court did not err in granting Countrywide's motion for summary judgment as to this count.

### Counts V and VI: Negligent and Fraudulent Misrepresentation

 Lastly, we address the Coverdells' counts for negligent and fraudulent misrepresentation. The elements that must be proven in order for a party to recover for "negligent misrepresentation" are: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss. *Roth v. Equitable Life Assurance Society of the United States,* 210 S.W.3d 253, 260 (Mo.App. E.D. 2006). The elements of "fraudulent misrepresentation" are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the

manner reasonably contemplated; (4) the hearer's reasonable reliance on its truth; and (5) the hearer's consequent and proximately caused injury. *Id.* at 260.

 Here, the allegations in this portion of the Coverdells' first amended petition were premised on an alleged oral communication from Barter to Silliman of the fact that Countrywide had approved the sale between Gross and the Coverdells and that the Coverdells relied on this communication in entering into other contracts relating to the Property. In its motion for summary judgment, Countrywide maintained the Coverdells could not prevail on these counts because "[they] did not and could not rely" on any representations made by Countrywide due to the fact that the Coverdells entered into the sales contract with Gross *"prior to* any alleged misrepresentation made by Countrywide, thus precluding ... proof of a necessary element of reliance in both claims." (Emphasis in original). Countrywide pointed out that Gross and the Coverdells signed their sales contract on the Property on December 8, 2005, and that the Coverdells turned around and signed their contracts with Zumalt and others between December 8, 2005, and December 12, 2005. The alleged oral communication between the realtors, upon which the Coverdells rely, then supposedly occurred sometime in January 2006. In their response, citing to the deposition testimony of Barter and Silliman, the Coverdells asserted "Countrywide gave its unconditional acceptance" of the transaction between Gross and the Coverdells; that "the record ... does not conclusively establish when Countrywide gave its approval" for the sale to proceed and when that approval was transmitted to the Coverdells; and that "the issue of whether a party reasonably relied upon another party's misrepresentation is a question of fact for the jury to decide."

In this instance, the Coverdells failed to rebut the assertions in Countrywide's motion for summary judgment. While the record reveals Barter opined the conversation occurred "about the same time" that she received a fax from Silliman on January 17, 2006, and Silliman related a similar time frame, the Coverdells do not point to anything in the record suggesting the conversation happened prior to the activities of early December 2005, when the Coverdells signed contracts with both Gross and Zumalt. This is especially true in light of Silliman's testimony that as of January 16 or 17, 2006, they "didn't have a contract" and all the parties "understood that, until the mortgage company had agreed" there would be no contract. The Coverdells cannot meet their burden of proving they relied on this conversation between their agent and Gross's agent. The trial court did not err in granting summary judgment in favor of Countrywide. Point denied.

The order and judgment of the trial court is affirmed.

GARY W. LYNCH, P.J., NANCY STEFFEN RAHMEYER, J., concur.