RAIL SWITCHING SERVICES, INC., Appellant,

v.

MARQUIS-MISSOURI TERMINAL, LLC, Respondent.

No. ED 105242

Missouri Court of Appeals,
Eastern District,
DIVISION ONE.

FILED: November 7, 2017

James R. Jarrow, 2400 Pershing Rd., St 500, Kansas City, MO 64108, Caroline Tinsley, 1010 Market St., Suite 950, St. Louis, MO 63101, for appellant.

Gerard T. Carmody, 120 S. Central, Suite 1800, St. Louis, MO 63105, for respondent.

KURT S. ODENWALD, Judge

### Introduction

Rail Switching Services, Inc. ("RSSI") appeals from the trial court's grant of summary judgment in favor of Marquis-Missouri Terminal, LLC ("MMT") on RSSI's claim for tortious-interference. RSSI alleged in its petition that MMT interfered with a contract between RSSI and the Pemiscot County Port Authority ("the Port Authority") granting RSSI exclusive use of the Port Authority's railway. The trial court found that the contract between RSSI and the Port Authority was void ab initio under Section 432.070.[1] The trial court then granted summary judgment, holding that, as a matter of law, MMT could not interfere with a void agreement.

On appeal, RSSI raises three points. First, RSSI asserts that summary judgment was improper because material facts remain in dispute on its claim for tortious interference. Second, RSSI claims that the trial court erred, as a matter of law, in holding that Section 432.070 rendered RSSI's contract void, and assuming arguendo, even if the agreement was void, the contract's invalidity did not preclude RSSI from obtaining relief on its claim for tortious interference. Third, RSSI argues that the trial court erroneously relied upon Section 432.070 to find the agreement be-

---

1. All statutory references are to RSMo Cum. Supp. (2013).

tween RSSI and MMT to be void because Section 432.070 is vague and therefore unconstitutional.

Because the record shows that there are no material facts in dispute, we deny RSSI's first point on appeal. We reject RSSI's second point on appeal because the trial court did not err in finding that the contract between RSSI and the Port Authority was void and that MMT could not interfere with a void contract. Finally, in its third point, we reject RSSI's claim that Section 432.070 is unconstitutional. We affirm the judgment of the trial court.

### Factual and Procedural History

The focal point of the present dispute is a five-mile railway owned by the Pemiscot County Port Authority ("the Port Authority Line") that extends from the town of Hayti, Missouri to the Mississippi River. The Port Authority Line connects with a mainline railway owned by the Burlington Northern and Santa Fe Railway Company ("the BNSF Line") in Hayti, Missouri.

In late 2011 or early 2012, RSSI[2] began negotiating for an agreement relating to RSSI's use of the Port Authority Line with David Madison ("Madison"), the Executive Director of the Port Authority. The Port Authority had previously entered into agreements with RSSI that allowed RSSI to store railcars owned by third parties on the Port Authority Line.

By March 2012, RSSI and Madison reached an agreement expanding RSSI's activities on the Port Authority Line. The agreement ("the 2012 Operating Agreement") allowed RSSI to continue storing railcars on the Port Authority Line. However, in its "Use and Operation" section, the 2012 Operating Agreement also provided the following:

> The [Port Authority] Line shall be used by RSSI operating as a non-common carrier contract switcher under the provisions of the Interstate Commerce Act, as amended. RSSI shall have *exclusive use* of the [Port Authority] Line for all rail purposes, provided, however, that 1) [the Port] Authority may, to the extent that it does not unreasonably interfere with RSSI's use thereof, continue to extend the [Port Authority] Line using its own forces and resources, and that 2) RSSI does not unreasonably hinder or interfere with the ability of [the Port] Authority to allow customers to ship or receive products or materials on the [Port Authority] Line.... It is understood, that a customer may provide his own means of switching his industry, i.e. a track mobile; but customers will not be allowed to retrieve from or deliver cars to the BNSF.... (emphasis added).

Madison and J. Michael Carr, the President of RSSI, signed the 2012 Operating Agreement. According to its own terms, the 2012 Operating Agreement was set to terminate after February 28, 2014.

A Board of Commissioners ("the Board") governs and administers the Port Authority.[3] Although Madison apprised the Board of his negotiations with RSSI and the existence of a new purported agreement, the Board never voted to approve the 2012 Operating Agreement. The Board, as an entity, never signed the 2012 Operating Agreement. Nor did the Board authorize, *in writing*, Madison to execute the 2012 Operating Agreement. The Board did not create or produce any writing expressly establishing Madison's authority,

---

**2.** RSSI also was known as Pioneer Resources, Inc. We will exclusively use RSSI when referring to Rail Switching Services, Inc. and Pioneer Resources, Inc.

**3.** See Section 68.045 (stating that "[e]very local port authority shall be administered by a board of port authority commissioners which shall consist of at least seven members").

as the Executive Director of the Port Authority, to execute the 2012 Operating Agreement on the Board's behalf.

In April 2012, Mark Marquis ("Marquis"), the President of MMT, contacted the Port Authority regarding MMT's interest in building an oil-storage facility near Hayti. MMT proposed building its facility along the Port Authority Line, where MMT would extract oil from arriving unit trains and load the oil onto barges for transport on the Mississippi River. Madison believed that MMT could become the Port Authority's most profitable customer.

By May 2012, MMT entered into a five-year Lease Agreement with the Port Authority to lease certain premises near the Port Authority Line. Marquis and Duane Michie ("Michie"), Chairman of the Board of Commissioners, signed the agreement. Pursuant to the Lease Agreement, MMT built a facility near the Port Authority Line, constructed storage tanks, installed 8,000 feet of additional track as rail siding, fitted pipelines for collecting and transferring oil, and connected additional rail switches. MMT spent approximately $15 million on these improvements.

In August 2012, MMT entered into a Railroad Track Usage Agreement with the Port Authority. Marquis and Michie signed and executed the agreement. The Railroad Track Usage Agreement granted MMT non-exclusive track access rights over and across the entire Port Authority Line for the movement of railcars, locomotives, and track mobiles to all points on the Port Authority Line. The Railroad Track Usage Agreement did not require MMT to use RSSI's services, nor did the agreement reference any rights RSSI had regarding the Port Authority Line. MMT planned to receive unit trains of oil, transported by BNSF Co., starting in mid-October 2012.[4]

When the Port Authority signed the Railroad Track Usage Agreement with MMT, Madison did not believe that MMT's operations violated the terms of the 2012 Operating Agreement. Madison also did not believe that the language in the "Use and Operation" section of the 2012 Operating Agreement required a customer on the Port Authority Line to use RSSI's services. Accordingly, Madison never instructed MMT that it needed to use RSSI to switch the unit trains or use RSSI to provide any services relating to receiving unit trains on the Port Authority Line.[5] On October 17, 2012, as scheduled, MMT began receiving unit trains of oil on the Port Authority Line.

Disputes subsequently arose over MMT's use of the Port Authority Line. RSSI maintained that the exclusive-use provision of the 2012 Operating Agreement prohibited MMT from directly receiving or delivering cars from the BNSF Line and that MMT was required to use RSSI's services to switch the unit trains from the BNSF Line to the Port Authority Line. In turn, MMT contended that its Railroad Track Usage Agreement with the Port Authority did not require MMT's use of

4. MMT also entered into a "Locomotive and Telemetry Device Use and Liability Agreement" with BNSF Co. that permitted MMT to use BSNF Co.'s locomotives to move the unit train or its railcars on the Port Authority Line.

5. MMT and RSSI dispute when MMT first became aware of the existence and terms of the 2012 Operating Agreement. RSSI asserts that MMT learned of the 2012 Operating Agreement before MMT entered into its contracts with the Port Authority. In contrast, MMT asserts that it did not know the essential terms of the 2012 Operating Agreement until after it had already entered into its contracts with the Port Authority. For the purposes of the appeal, we will assume that RSSI, as the non-movant, is correct.

RSSI's services and that, even if valid, the 2012 Operating Agreement prohibited RSSI's unreasonable interference with the ability of the Port Authority's customers to receive products on the Port Authority Line.

Embroiled in conflict over the use of the Port Authority Line, the Port Authority filed suit, seeking a declaratory judgment that its 2012 Operating Agreement with RSSI was void.[6] The Port Authority averred that it was a municipal corporation subject to the mandate of Section 432.070 requiring contracts with municipal corporations to be in writing. The Port Authority argued that its agreement with RSSI was void due to non-compliance with the statute because the Port Authority never signed the 2012 Operating Agreement. The Port Authority moved for summary judgment. Finding for the Port Authority, the trial court declared the 2012 Operating Agreement void ab initio for violating Section 432.070's mandate that contracts of a municipal corporation be subscribed by the parties, or their agents authorized by law, duly appointed, and authorized in writing. RSSI appealed. On appeal, the Southern District of this Court affirmed the trial court's judgment, holding that Section 432.070 applied to the Port Authority's contract with RSSI and that the 2012 Operating Agreement did not comply, actually or substantially, with the statute's requirements. Pemiscot Cty. Port Auth. v. Rail Switching Servs., 523 S.W.3d 530, 535-36 (Mo. App. S.D. 2017). The Supreme Court of Missouri denied transfer. Pemiscot Cty. Port Auth. v. Rail Switching Servs., 2017 Mo. LEXIS 354 (SC96505) (Mo, Aug. 22, 2017).

While its lawsuit against the Port Authority was pending, RSSI filed a one-count petition against MMT alleging tortious interference.[7] In its petition, RSSI asserted that the 2012 Operating Agreement "granted RSSI the exclusive right of operation for all rail purposes" and that the agreement "prohibited [Port Authority] customers from retrieving or delivering cars to/from BNSF." RSSI further claimed that MMT knew of the terms of the 2012 Operating Agreement; however, MMT entered into agreements with BNSF Co. and the Port Authority in direct contravention of RSSI's purported contract with the Port Authority. Specifically, RSSI alleged that when "MMT entered into its Lease and Usage Agreement with [the Port Authority], RSSI and [the Port Authority] had a valid, existing contract that gave RSSI exclusive use of the [Port Authority] Line for all purposes as the sole rail carrier authorized to retrieve from or deliver cars to BNSF." RSSI maintained that, although informed of the terms of the 2012 Operating Agreement, "MMT intentionally induced [the Port Authority] to breach its contractual obligations to RSSI to avoid the cost and expense of RSSI providing MMT's rail switching needs, and continues to do so." According to RSSI, MMT lacked any "justification or excuse for interfering with [the 2012 Operating Agreement] or for inducing [the Port Authority] to breach said agreement." MMT moved for summary judgment on RSSI's claim, and RSSI filed a counter-motion for summary judgment.

The trial court adjudicating RSSI's tortious-interference claim entered summary

---

6. The Port Authority filed suit in Pemiscot County, which lies within the territorial jurisdiction of the Southern District of the Missouri Court of Appeals. Section 477.060.

7. Initially, RSSI filed suit in Pemiscot County. By agreement of the parties, the court transferred the case to St. Louis County. St. Louis County lies within the territorial jurisdiction of the Eastern District of the Missouri Court of Appeals. Section 477.050.

judgment in favor of MMT and against RSSI. The trial court found that RSSI pursued a claim for MMT's alleged tortious interference with the 2012 Operating Agreement, but that the 2012 Operating Agreement had been declared void ab initio in the prior suit. Because RSSI could not establish the existence of a valid contract, MMT was entitled to judgment in its favor as a matter of law on RSSI's claim for tortious inference with the 2012 Operating Agreement. The trial court entered summary judgment in favor of MMT on RSSI's petition. This appeal follows.[8]

## Points on Appeal

RSSI raises three points. First, RSSI asserts that entry of summary judgment was error because material facts remain in dispute regarding the validity of the 2012 Operating Agreement, RSSI's business expectancies with the Port Authority, and MMT's improper inducement of the Port Authority to breach its contractual agreements. Second, RSSI claims the trial court erred in determining that Section 432.070 rendered void the 2012 Operating Agreement, and that the contract's invalidity precluded RSSI from obtaining relief. Third, RSSI argues that Section 432.070, and in particular the statute's use of the phrase "other municipal corporation," is unconstitutionally vague.

## Standard of Review

 We review summary judgment de novo. Brentwood Glass Co. v. Pal's Glass Serv., Inc., 499 S.W.3d 296, 300 (Mo. banc 2016) (referencing ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993)). "Summary judgment is appropriate when 'there is no genuine dispute about

material facts and, under the undisputed facts, the moving party is entitled to judgment as a matter of law.'" Bishop & Assocs., LLC v. Ameren Corp., 520 S.W.3d 463, 468 (Mo. banc 2017) (quoting Parr v. Breeden, 489 S.W.3d 774, 778 (Mo. banc 2016)). A defending party establishes entitlement to summary judgment by demonstrating:

(1) facts negating any of the claimant's necessary elements; (2) the claimant, after an adequate period of discovery, has been unable, and will not be able, to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute of the existence of facts required to support the defending party's properly pleaded affirmative defense.

Scottsdale Ins. Co. v. Addison Ins. Co., 448 S.W.3d 818, 826 (Mo. banc 2014) (citing ITT Commercial Fin. Corp., 854 S.W.2d at 381). Each of these methods individually establishes that the defending party's right to judgment as a matter of law. Goerlitz v. City of Maryville, 333 S.W.3d 450, 453 (Mo. banc 2011). This Court will affirm the trial court's grant of summary judgment on any reasonable theory supported by the record. Id.

 On review, we view factual assertions in the light most favorable to the non-movant and draw all reasonable factual inferences in the non-movant's favor. Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Trust Co., 464 S.W.3d 177, 183 (Mo. banc 2015). But, we accept as true the facts contained in the moving party's affidavits or otherwise propounded in support of the moving party's motion, unless the non-moving party's response

---

**8.** RSSI appealed directly to the Supreme Court of Missouri, positing that its appeal challenged the constitutionality of Section

432.070. The Supreme Court of Missouri transferred the cause to this court.

properly contradicts the proffered facts. Goerlitz, 333 S.W.3d at 452-53. In the context of summary judgment, a material fact is one from which the right to judgment flows. Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC, 422 S.W.3d 312, 320 (Mo. banc 2014) (citing Goerlitz, 333 S.W.3d at 453). "A genuine dispute exists when 'the issue, or dispute, [is] a real and substantial one—one consisting not merely of conjecture, theory[,] and possibilities.'" Brentwood Glass Co., 499 S.W.3d at 300 (quoting ITT Commercial Fin. Corp., 854 S.W.2d at 378).

## Discussion

We will discuss RSSI's three points on appeal in reverse order. Because Point Three challenges the constitutionality of a state statute—and thereby potentially depriving this Court of jurisdiction to consider the appeal—we will begin with Point Three. Next, we will consider Point Two regarding whether RSSI established a viable claim against MMT as a matter of law. Finally, we will review Point One and decide whether there are any material facts in dispute.

## I. Point Three—The Constitutionality of Section 432.070

### A. Appellate Jurisdiction

■ In Point Three, RSSI argues that Section 432.070 is unconstitutional. Among the cases that fall within the Supreme Court of Missouri's exclusive appellate jurisdiction are those involving the constitutional validity of a state statute. Carver v. Delta Innovative Servs., 379 S.W.3d 865, 873 (Mo. App. W.D. 2012). However, a party's mere assertion of the constitutional invalidity of a state statute does not by itself deprive this Court of jurisdiction. Id. Instead, this Court reviews the proffered constitutional challenge "to see if it is substantial, in which case juris-

diction would vest in the Missouri Supreme Court." Guthrie v. Mo. Dep't of Labor & Indus. Relations, 503 S.W.3d 261, 271 (Mo. App. W.D. 2016) (quoting Tadrus v. Mo. Bd. of Pharmacy, 849 S.W.2d 222, 225 (Mo. App. W.D. 1993)). When a party's claim is not real and substantial, but instead is only colorable, our Court maintains jurisdiction and can review the claim. Id. When reviewing a constitutional challenge to determine whether it is real and substantial, or merely colorable, we "make[ ] a preliminary inquiry as to whether it presents a contested matter of right that involves fair doubt and reasonable room for disagreement." Carver, 379 S.W.3d at 873 (quoting White v. White, 293 S.W.3d 1, 24 (Mo. App. W.D. 2009)). If the preliminary inquiry determines that the constitutional claim is so legally or factually insubstantial as to be plainly meritless, the claim is merely colorable. Guthrie, 503 S.W.3d at 271. As described below, we conclude that RSSI's constitutional claim is not real and substantial, and thus, we have jurisdiction to consider the present appeal.

### B. Section 432.070 is not Unconstitutionally Vague

RSSI argues that the 2012 Operating Argument is not subject to the requirements of Section 432.070 because the statute is vague, and therefore unconstitutional. In particular, RSSI claims that the term "other municipal corporation" as used in Section 432.070 prevents persons of common understanding from deciphering the meaning of the provision. RSSI implores us to hold the term void, or in the alternative, to invalidate the entire section. In turn, MMT argues that the legislature need not define "other municipal corporation," and appellate courts have issued decisions sufficiently describing the term's meaning in the context of Section 432.070.

"The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application violates the first essential of due process of law." Baugus v. Dir. of Revenue, 878 S.W.2d 39, 41 (Mo. banc 1994). The test for vagueness is whether the language used "conveys to a person of ordinary intelligence a sufficiently definite warning as to the proscribed [or prescribed] conduct when measured by common understanding and practices." State ex rel. Zobel v. Burrell, 167 S.W.3d 688, 692 (Mo. banc 2005) (quoting State v. Brown, 140 S.W.3d 51, 54 (Mo. banc 2004)). "[N]either absolute certainty nor impossible standards of specificity are required in determining whether terms are impermissibly vague." Harjoe v. Herz Fin., 108 S.W.3d 653, 655 (Mo. banc 2003). Finally, appellate courts will permit greater tolerance of enactments with civil consequences rather than criminal penalties because the significance of imprecision is qualitatively less severe. See Cocktail Fortune v. Supervisor of Liquor Control, 994 S.W.2d 955, 957-58 (Mo. banc 1999); Psychiatric Healthcare Corp. v. Dep't of Soc. Servs., Div. of Med. Servs., 100 S.W.3d 891, 903 (Mo. App. W.D. 2003).

Here, Section 432.070 provides:

No county, city, town, village, school township, school district *or other municipal corporation* shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents author-ized by law and duly appointed and authorized in writing. (emphasis added).

As did the Southern District of this Court, we reject RSSI's claim that the undefined term of "other municipal corporation" prevents common understanding of both the term and the section as a whole. See Pemiscot Cty. Port Auth. v. Rail Switching Servs., 523 S.W.3d 530, 536 (Mo. App. S.D. 2017) (in dicta expressing its "skepticism" to RSSI's claim that the term "other municipal corporation" renders Section 432.070 unconstitutionally vague). By its plain language, the statute requires that all contracts with municipal corporations must be subscribed by the parties in writing or there must be written authorization given to the municipal corporation's agent. See Withers v. City of Lake St. Louis, 318 S.W.3d 256, 263-264 (Mo. App. E.D. 2010). Although the statute does not specifically define "other municipal corporations," it need not do so when the meaning of the term is sufficiently discernible. See, e.g., Carter's Custom Tile & Remodeling, Inc. v. Sw. Bell Tel. Co., 834 S.W.2d 892, 895 (Mo. App. E.D. 1992) (finding that the term "other communications services," although undefined in the statute, did not render the provision or the term itself void).

The term "municipal corporation or municipality" can vary in meaning depending on the time, place, and circumstances under which it is used. State ex rel. Milham v. Rickhoff, 633 S.W.2d 733, 735 (Mo. banc 1982); City of Olivette v. Graeler, 338 S.W.2d 827, 835 (Mo. 1960) (overruled in part on other grounds, Town & Country v. St. Louis Cty., 657 S.W.2d 598, 608 (Mo. banc 1983)). In a strict sense, the term municipal corporation may apply "only to incorporated cities, towns and villages, having subordinate and local powers of legislation." Laret Inv. Co. v. Dickmann, 345 Mo. 449, 134 S.W.2d 65, 68 (Mo. 1939)

(quoting State ex rel. Caldwell v. Little River Drainage Dist., 291 Mo. 72, 236 S.W. 15, 16 (Mo. 1921)); see, e.g., Beiser v. Parkway Sch. Dist., 589 S.W.2d 277, 279, 281 (Mo. banc 1979) (defining the term "municipality" to exclude school districts for the purposes of Section 71.185). "But in the *larger and ordinarily accepted sense* the term is applied to any public local corporation, exercising some function of government." City of Olivette, 338 S.W.2d at 835 (emphasis added); see also Laret Inv. Co., 134 S.W.2d at 68 (stating that "in a broader sense [the term municipal corporation] includes public, or quasipublic, corporations designed for the performance of an essential public service. . . . This court has adopted the broader definition."). Accordingly, a "municipal corporation," in the broader sense includes public corporations created to implement necessary public services and is applied to any public municipal corporation employing some function of government. St. Louis Hous. Auth. v. City of St. Louis, 361 Mo. 1170, 239 S.W.2d 289, 295 (Mo. 1951) (internal citations omitted); see also Laret Inv. Co., 134 S.W.2d at 68.

As a result, Missouri courts repeatedly have accepted and affirmed the expansive meaning of "other municipal corporation" in the application of Section 432.070. Indeed, Missouri courts have applied Section 432.070 to the following public entities as "other municipal corporations": a redevelopment authority (Pace v. Land Clearance for Redev. Auth., 713 S.W.2d 34, 36 (Mo. App. W.D. 1986)), a fire protection district (McCarthy v. Cmty. Fire Prot. Dist., 876 S.W.2d 700, 703-04 (Mo. App. E.D. 1994)), industrial and economic development authorities (Septagon Constr. Co. v. Indus. Dev. Auth. of the City of Moberly, 521 S.W.3d 616, 627 (Mo. App. W.D. 2017)), a road district (Plaster v. Lebanon Special Rd. Dist., 611 S.W.2d 560, 564 (Mo. App.

S.D. 1981)), a county hospital (Langlois v. Pemiscot Mem. Hosp., 185 S.W.3d 711, 713 (Mo. App. S.D. 2006)) and a sewer district (Duckett Creek Sewer Dist. v. Golden Triangle Dev. Corp., 32 S.W.3d 178, 182 (Mo. App. E.D. 2000)).

For the purposes of Section 432.070, the term "other municipal corporations" sufficiently informs the public of the possible government entities falling under the statute's purview. The broad purpose of Section 432.070 is to *protect public entities.* Orf Constr. v. Black Jack Fire Prot. Dist., 239 S.W.3d 685, 687 (Mo. App. E.D. 2007). In furtherance of that purpose, the qualifier "municipal" sufficiently narrows and limits the statute's application to achieve its function. Indeed, any party negotiating with a public entity must consider the application of Section 432.070. "It is well established in Missouri 'that all contracts with a municipal corporation must be in writing and all persons dealing with a municipal corporation are charged with notice of that law.'" Septagon Constr. Co., 521 S.W.3d at 626 (quoting Gill Constr., Inc. v. 18th & Vine Auth., 157 S.W.3d 699, 708 (Mo. App. W.D. 2004)); see also Monarch Fire Prot. Dist. v. Prof'l Fire Fighters of E. Mo. Local 2665, of Int'l Ass'n of Fire Fighters, 493 S.W.3d 916, 923 (Mo. App. E.D. 2016) (commenting that the "Missouri legislature has left no doubt as to what formalities a public entity should observe to create a binding contract.").

In the end, RSSI has failed to establish a real and substantial constitutional challenge to the validity of Section 432.070. Given the guidance provided by Missouri courts, the term "other municipal corporations" and the provisions of Section 432.070 are clearly discernible; thus, RSSI's argument is legally and factually meritless. Point Three is denied.[9]

---

**9.** RSSI makes additional arguments. First,

RSSI argues that "municipal corporation" is

## II. Point Two—MMT is Entitled to Judgment as a Matter of Law

In Point Two, RSSI argues that the trial court erred in finding that MMT did not tortiously interfere with the 2012 Operating Agreement as a matter of law. RSSI posits that the 2012 Operating Agreement was a valid contract because Section 432.070 does not apply to port authorities. In the alternative, RSSI argues that it actually, or substantially, complied with the statutory requirements. Lastly, RSSI contends that, even if the 2012 Operating Agreement is held void, the invalidity of the contract does not bar its claim of tortious interference against MMT.

We first address the elements of a tortious-interference claim. We then will address whether the 2012 Operating Agreement was void. Finally, we will discuss whether the invalidity of the 2012 Operating Agreement causes RSSI's claim to fail as a matter of law.

### A. Tortious Interference with a Contract or Business Expectancy

■ As recognized by our Supreme Court, a claim for tortious interference with a contract or business expectancy requires proof of each of the following: "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." Bishop & Assocs., LLC v. Ameren Corp., 520 S.W.3d 463, 472 (Mo. banc 2017); see also Farrow v. St. Francis Med. Ctr., 407 S.W.3d 579, 602 (Mo. banc 2013); Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 614 (Mo. banc 2006). Such claims are sometimes referred to as a tortious interference with business relations. See, e.g., Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co., 586 S.W.2d 310, 315 (Mo, banc 1979).

Traditionally, Missouri courts have distinguished between claims for tortious interference with contracts and tortious interference with business expectancies. In Downey v. United Weatherproofing, Inc.,

defined in a limited fashion in the constitution, citing Mo. Const. Art. VI, Sec. 15. Art. VI, Sec. 15 provides: "The general assembly shall provide by general laws for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the powers of each class shall be defined by general laws so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions." Although in Art. VI, Sec. 15 the term "all such municipal corporations" is referencing the cities and towns previously stated in the provision, cities and towns are not the only municipal corporations. See Beiser, 589 S.W.2d at 280 (stating that "not all municipal corporations are municipalities"); Laret Inv. Co., 134 S.W.2d at 68 (recognizing that municipal corporations can include under the Missouri Constitution, in addition to cities and towns, counties, school districts, townships under township organization, special road districts, and drainage districts). Second, RSSI cites to Hannibal v. Winchester, 391 S.W.2d 279, 287 (Mo. banc 1965), for the proposition that a municipal corporation must have both a defined territory and inhabitants. However, Hannibal addressed the corporate limitations of cities; "[w]e hold that the City has defined its corporate limits in its charter, and that in fact no city can legally adopt a valid charter without 'defining' in some manner its existing corporate limits." Id. Third, RSSI claims that the application of Section 432.070 to the 2012 Operating Agreement violated its Due Process Rights under the Fourteenth Amendment. However, this point was not included in RSSI's point relied on. Because it was not included in the point relied on, we will not address it. See C.S. v. Mo. Dep't of Soc. Servs., Children's Div., 491 S.W.3d 636, 656 (Mo. App. W.D. 2016) (stating that claims of error raised in the argument portion of a brief, but that are not raised in the party's point relied on, are not preserved for appellate review).

the Supreme Court recognized that protection from interference with contracts is but one instance of the protected commercial relations under Missouri law. 363 Mo. 852, 253 S.W.2d 976, 980 (Mo. 1953). The Downey court determined that, although "[a]n existing contract may be a basis for greater protection," some protection "is appropriate against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking." Id. The Downey court continued: "The unjustifiable character of the alleged wrongdoer's conduct and the harm caused thereby may be equally clear in both instances, but the differentiation between them relates to the scope of the privileges, or the kind and amount of interference that is justifiable in view of the differences in the facts." Id. Indeed, "while the right of free competition in business is recognized as the right of every citizen, the right to the performance of an existing contract is a right to rely upon another's present commitment and *consequently one of greater expectancy* than is the right to enter into future contracts even in a competitive field." Id. at 981 (emphasis added).

As a result, the distinction between interference with a contract and interference with a business expectancy was critical in considering the amount or intensity of interference society would tolerate with the protected business relationship. See id. at 980. In cases pertaining to interference with contracts, plaintiffs were generally not required to plead that the defendant used any improper means. See Clinch v. Heartland Health, 187 S.W.3d 10, 16-17 (Mo. App. W.D. 2006); Compare Tri-Conti-

nental Leasing Co. v. Neidhardt, 540 S.W.2d 210, 215 (Mo. App. St. Louis 1976) (stating that, because the plaintiff established a valid contract, the plaintiff need not show that the defendants interfered by using improper means) with Friedman v. Edward L. Bakewell, Inc., 654 S.W.2d 367, 370 (Mo. App. E.D. 1983) (explaining that the plaintiffs' petition failed, in part, because it did not plead that the defendants used improper means in interfering with the plaintiffs' business expectancy).

Yet, the precise distinction between these two claims of tortious interference remained elusive, and subsequent cases blurred the differences between interference with contracts and interference with business expectancies. Indeed, later decisions suggested that in all cases where the defendant has a legitimate interest, economic or otherwise, in the contract *or* expectancy sought to be protected, then the plaintiff must show that the defendant used improper means to interfere. See Clinch, 187 S.W.3d at 16-17 (referencing Nazeri v. Mo. Valley Coll., 860 S.W.2d 303, 317 (Mo. banc 1993)).

 Despite some lack of clarity, Missouri law continues to treat these two forms of tortious interference as distinct and separate torts. See, e.g., Honigmann v. Hunter Grp., Inc., 733 S.W.2d 799, 807-08 (Mo. App. E.D. 1987) (listing different elements for, and considering as separate, the torts of tortious interference with a business expectancy and tortious interference with a contract); Restatement (Second) of Torts Section 766-(b) (1979).[10] Generally, allegations of tortious interference with a

---

**10.** Missouri generally follows the Restatement regarding the different claims of tortious interference. See Howard v. Youngman, 81 S.W.3d 101, 113 (Mo. App. E.D. 2002) (stating that, in analyzing tortious interference, "Missouri courts have been guided by the Restatement (Second) Torts, Section 766-

774."). Although unrelated here, Missouri courts do not recognize a cause of action under Section 766(a) of the Restatement: "Intentional Interference with Another's Performance of His Own Contract." Mprove v. KLT Telecom, Inc., 135 S.W.3d 481, 495-96 (Mo. App. W.D. 2004).

contract refer to the defendant's intrusion on an existing contract. See, e.g., City Bank & Trust Co. v. Thomas, 735 S.W.2d 121, 122-123 (Mo. App. E.D. 1987); Restatement (Second) of Torts Section 766 (1979). In comparison, allegations of tortious interference with a business expectancy generally pertain to the defendant's interference with a reasonable expectancy of future financial benefit. See Stehno v. Spring Spectrum, L.P., 186 S.W.3d 247, 250-51 (Mo. banc 2006). The distinction between the two forms of tortious interference is reflected by the Supreme Court's use of the disjunctive in discussing the elements of the separate theories. See, e.g., Bishop & Assocs., LLC, 520 S.W.3d at 472 (stating that the elements for "[t]ortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy") (emphasis added).

Correspondingly, the Supreme Court has identified, as elements of a claim for tortious interference with a business expectancy, the following elements: "(1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." Stehno, 186 S.W.3d at 250; see also Bell v. May Dep't Stores Co., 6 S.W.3d 871, 876 (Mo. banc 1999) (stating that the first element in a claim for tortious interference with a credit expectancy is "a valid credit expectancy."). Further, appellate courts have identified the following elements for a tortious-interference-with-contract allegation: "(1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct." Howard v. Youngman, 81 S.W.3d 101, 112-13 (Mo. App. E.D. 2002); see also Coverdell v. Countrywide Home Loans, Inc., 375 S.W.3d 874, 881 (Mo. App. S.D. 2012); Duvall v. Silvers, 998 S.W.2d 821, 827 (Mo. App. W.D. 1999).[11]

To state, then, a successful "claim for tortious interference with a contract or business expectancy, a plaintiff must plead and prove inter alia a contract or valid business expectancy." Blackwell Motors, Inc. v. Manheim Servs. Corp., 529 S.W.3d 367, 379, 2017 WL 4127459, at *10, 2017 Mo. App. LEXIS 937, at *28 (Mo. App. E.D. Sept. 19, 2017) (emphasis added). Regarding tortious interference with a contract, the plaintiff must plead and prove a valid contract that was in effect at the time of the induced breach. Rhodes Eng'g Co. v. Pub. Water Supply Dist. No. 1, 128 S.W.3d 550, 565 (Mo. App. W.D.

11. RSSI argues that both forms of tortious interference fall under a more general and all-encompassing tort of interference with business relations. The Supreme Court, in Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co., recognized that the appealing plaintiffs did not need to establish the existence of a contract or a pre-existing business relation to recover for the defendants' tortious interference, and the plaintiffs could recover for interference with prospective commercial expectancies. 586 S.W.2d 310, 315 (Mo. banc 1979). In doing so, the Fischer court identified that the first element of a claim for "tortious interference with business relations" in Missouri was "[a] contract or a valid business relationship or expectancy (not necessarily a contract)." Id. (quoting Salomon v. Crown Life Ins. Co., 536 F.2d 1233, 1238 (8th Cir. 1976)). The Fischer court recognized that protected relationships under Missouri law and Downey could include both existing contracts and prospective business expectancies. See id. We are not convinced, however, given subsequent Missouri case law, that the Fischer court intended to acknowledge the existence of only a single tort of tortious interference or otherwise disavow the remaining distinctions between interference with contracts and interference with business expectancies.

2004); Restatement (Second) of Torts, Section 766 cmt. f. (1979). Regarding tortious interference with a business expectancy, the plaintiff must plead a valid business expectancy; "it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with." Gott v. First Midwest Bank, 963 S.W.2d 432, 438 (Mo. App. S.D. 1998); see also W. Blue Print Co. v. Roberts, 367 S.W.3d 7, 19 (Mo. banc 2012) (determining whether a company's expectancy that it would win a university-contract bid was reasonable and valid under the circumstances presented). The pleaded business expectancy may, but need not, be based on an existing enforceable contract. BMK Corp. v. Clayton Corp., 226 S.W.3d 179, 190 (Mo. App. E.D. 2007).

B. The 2012 Operating Agreement was Void Ab Initio

RSSI posits that the 2012 Operating Agreement was valid and in effect at the time of MMT's purported interference. In so doing, RSSI formulates a lengthy and elaborate argument that port authorities are not subject to the contracting requirements of Section 432.070 and that, in the alternative, RSSI actually or substantially fulfilled all of the necessary requirements to establish a valid contract with a municipal corporation, However, this is not the first time that RSSI raises these arguments. In the declaratory-judgment action, the Port Authority asserted that Section 432.070 applied to the 2012 Operating Agreement and rendered the purported contract void ab initio. Pemiscot Cty. Port Auth. v. Rail Switching Servs., 523 S.W.3d 530, 532 (Mo. App. S.D. 2017). RSSI vigorously challenged the statute's applicability to port authorities, and maintained that its agreement with the Port Authority fully complied with the statute. Id. at 535. The

trial court rejected RSSI's argument and found in favor of the Port Authority. Id. at 532. On appeal, the Southern District of this Court again "reject[ed] RSSI's lengthy argument that Port Authority, formed by Pemiscot County under RSMo Chapter 68, is not a 'municipal corporation' for purposes of [Section] 432.070." Id. at 535. The Southern District also rejected RSSI's argument that it substantially complied with the requirements of the statute. Id. at 536 n.7. The Supreme Court of Missouri denied RSSI's motion to transfer.

RSSI provides no persuasive reason why we should deviate from the holding of the Southern District of this Court in Pemiscot County Port Authority. The Pemiscot County Port Authority court specifically analyzed the arguments RSSI offers here—and rejected them—before holding that a port authority, formed under Chapter 68 RSMo, is a municipal corporation for the purposes of Section 432.070. Id. at 535. Moreover, the decision in Pemiscot County Port Authority is consistent with cases applying the term municipal corporation in a broad sense to municipal corporations designed to perform public governmental purposes. See. e.g., Septagon Constr. Co. v. Indus. Dev. Auth. of the City of Moberly, 521 S.W.3d 616, 627 (Mo. App. W.D. 2017); Pace v. Land Clearance for Redev. Auth., 713 S.W.2d 34, 36 (Mo. App. W.D. 1986). Applying RSSI's narrow interpretation and conceptualization of Section 432.070 would unnecessarily create inconsistent legal rulings and impede Section 432.070's purpose of safeguarding the public from "needless and extravagant demands" as well as restraining public officials from "ill-considered actions." Langlois v. Pemiscot Mem. Hosp., 185 S.W.3d 711, 713 (Mo. App. S.D. 2006), Accordingly, we hold that Section 432.070 governs contracts entered into with port authorities established under

Chapter 68. <u>Pemiscot Cty. Port Auth.</u>, 523 S.W.3d at 535.

■ Because the 2012 Operating Agreement was subject to Section 432.070, the circumstances here demand that the authority for such a contract be in writing. <u>Moynihan v. City of Manchester</u>, 265 S.W.3d 350, 354 (Mo. App. E.D. 2008). Even though a written contract was signed by a purported agent of the governing entity, the contract is not valid unless the governing entity duly authorized the agent, in writing, to enter into the agreement on its behalf. <u>See id.</u> (stating that "a contract, even though in writing and signed by a city's mayor, 'is not valid unless duly authorized by the Board of Alderman.'"). It is not disputed that the 2012 Operating Agreement was in writing and signed by Madison, the Executive Director of the Port Authority.[12] But fatal to RSSI's challenge, no writing exists to establish Madison's authority to enter into the 2012 Operating Agreement. Nor does RSSI allege that any such writing exists. Given the express statutory requirements of Section 432.070, RSSI is unable to lawfully establish that Madison had the requisite written authority to contract with RSSI.

■ RSSI further reasons that, even if the 2012 Operating Agreement fails to meet the writing requirements of Section 432.070, its substantial compliance with the statute was sufficient to create a valid contract. We acknowledge that, in limited circumstances, substantial compliance with Section 432.070 may create a valid contract. <u>See</u> <u>Muncy v. City of O'Fallon</u>, 145

S.W.3d 870, 873 (Mo. App. E.D. 2004). "Nevertheless, the records of a [municipal corporation] must disclose authorization for the execution of a contract, and such authorizing record 'must not be vague and uncertain but must sufficiently identify the subject matter under consideration with reasonable exactitude and specificity.'" <u>Moynihan</u>, 265 S.W.3d at 354 (quoting <u>Shadowood Dev. Co. v. City of Lake St. Louis</u>, 668 S.W.2d 647, 648 (Mo. App. E.D. 1984)).

Again, significant to our analysis, the record does not contain any clear authorization from the Port Authority to Madison. The Board's minutes reflect that Madison informed the Board he was negotiating with RSSI pertaining to railcar storage, and that he had a proposed agreement with RSSI. Neither the Board's minutes nor the record before us evidences the Board's authorization to Madison to sign the 2012 Operating Agreement on its behalf. No evidence of a formal motion to approve the contract is show in the record. RSSI concedes that the Board took no formal vote to authorize Madison to execute the agreement or otherwise accept the 2012 Operating Agreement. In addition, the Port Authority's bylaws do not authorize Madison to enter into contracts of the nature of the 2012 Operating Agreement on the Board's behalf, The mere fact that Madison informed the Board of his negotiations and the existence of an agreement does not establish the requisite authorization for Madison to enter into the terms expressed in the 2012 Operating Agreement.[13] Accordingly, the record does

---

**12.** RSSI maintains that Madison was not an agent of the Port Authority, but rather the true contracting party; RSSI suggests that the term "agent" means someone unaffiliated with the Port Authority. RSSI puzzlingly claims that, because no agent signed the 2012 Operating Agreement, no written authorization is required. We reject RSSI's argument,

finding that Madison was a purported agent of the Port Authority, subject to the control of the Port Authority's Board.

**13.** RSSI asserts that the 2012 Operating Agreement demonstrates Madison's authorization to enter into the agreement. Above Madison's signature, the 2012 Operating

not support RSSI's claim that it actually or substantially complied with the statutory requirements of Section 432.070.

 The requirements of Section 432.070 are mandatory, not discretionary. Orf Constr., Inc. v. Black Jack Fire Prot. Dist., 239 S.W.3d 685, 687 (Mo. App. E.D. 2007). A contract made in violation of Section 432.070 is void ab initio, not merely voidable, a vital distinction in contract law. See Moynihan, 265 S.W.3d at 354; Thies v. St. Louis Cty., 402 S.W.2d 376, 380 (Mo. 1966). Courts "unhesitatingly should enforce compliance with all mandatory provisions of the statutes intended to protect municipalities and their inhabitants." Muncy, 145 S.W.3d at 873. Indeed, "Section 432.070 is given a strict and literal interpretation ... unrelieved by considerations of equity which relieve against hardship and unjust enrichment of private persons whose contracts might fall short of strict legal requirements." Pace, 713 S.W.2d at 36. Thus, as a void agreement, the 2012 Operating Agreement is not enforceable against the Port Authority in any manner, see Muncy, 145 S.W.3d at 873, and cannot be relied on by RSSI for any purpose, see Thies, 402 S.W.2d at 380. Our application of well-established legal principles precludes us from recognizing the validity of an agreement entered into in violation of Section 432.070, despite the harshness that may result.[14] Ballman v. O'Fallon Fire Prot. Dist., 459 S.W.3d 465, 468 (Mo. App. E.D. 2015).

We are not persuaded that we can—much less that we should—deviate from the Southern District's holding that Section 432.070 governs contracts with port authorities. We further hold that RSSI failed to actually or substantially comply with the requirements of Section 432.070. As a result, we agree with the Southern District's holding that the 2012 Operating Agreement was void ab initio, and we reject RSSI's arguments that it had a valid contract with the Port Authority.

 Having resolved the issue of the validity of the 2012 Operating Agreement, we now turn to RSSI's claim as raised before the trial court. Regarding its claim for tortious interference, RSSI pled in its petition against MMT that RSSI had a valid contract with the Port Authority, the 2012 Operating Agreement. RSSI pled that MMT tortiously interfered with *that* contract. As we have noted, the 2012 Operating Agreement was invalid ab initio as a matter of law. In the matter of an invalid contract, there "can be no liability for the breach of an invalid contract, and, of course, one cannot be charged with liability for inducing another to refrain from doing that which he was not legally bound to do." Rhodes Eng'g Co., 128 S.W.3d at 565; see also Restatement (Second) of Torts, Section 766 (1979) (stating, in comment f, "[t]he particular agreement must be in force and effect at the time of the breach that the actor has caused; and if for any reason it is entirely void, there is no

Agreement states: "IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by the duly authorized officers or officials[.]" However, the document "cannot, *ex post facto*, provide the authorization for its execution." Pemiscot Cty. Port Auth., 523 S.W.3d at 536 n.7 (quoting Moynihan, 265 S.W.3d at 356).

14. We appreciate that the purpose of Section 432.070 is to protect public entities and not defendants sued in their private capacities,

Kantel Commc'ns v. Casey, 865 S.W.2d 685, 691 (Mo. App. W.D. 1993); Casterline v. Stuerman, 588 S.W.2d 86, 88 (Mo. App. E.D. 1979). While usually a non-municipal entity cannot raise or benefit from Section 432.070, here the invalidity ab initio of the 2012 Operating Agreement was recognized and resolved in a suit between the Port Authority and RSSI, rather than raised first and litigated by the alleged tortfeasors.

liability for causing its breach."); see generally Hyatt v. TWA, 943 S.W.2d 292, 297 (Mo. App. E.D. 1997) (determining that "[o]ne of the essential elements of a tortious interference with contract action is the existence of a contract"). In other words, the law does not protect a contract that a court has determined was void ab initio. See Rhodes Eng'g Co., 128 S.W.3d at 565; Restatement (Second) of Torts, Section 766 cmt. f. (1979). Consequently, RSSI cannot establish that it had a valid, existing contract with which MMT interfered and lawfully cannot prevail on a claim for tortious interference with the 2012 Operating Argument.

C. **RSSI Did Not Plead a Valid Business Expectancy**

The invalidity of the 2012 Operating Agreement did not necessarily preclude RSSI from seeking damages due to MMT's alleged conduct. RSSI was not limited to pleading the existence of a valid contract in order to obtain relief for tortious interference. Here, RSSI might have alleged the existence of a valid business expectancy in order to satisfy the first element required for a tortious-interference-with-a-business-expectancy claim. See Kantel Commc'ns v. Casey, 865 S.W.2d 685, 690 (Mo. App. W.D. 1993) (stating that "[a] reasonable expectation of economic advantage or commercial relation will support a claim for wrongful interference with business expectancy even in the face of an unenforceable contract."); Casterline v. Stuerman, 588 S.W.2d 86, 88 (Mo. App. E.D. 1979) (expressing that a party potentially may have a protected expectancy or relationship that the law will endeavor to protect even in the absence of an enforceable contract).

However, RSSI did not plead in its petition against MMT that it had *a valid business expectancy* with the Port Authority. Instead, RSSI pled only that it had a valid contract with the Port Authority. In the sole count of its petition, RSSI claimed that the 2012 Operating Agreement "granted RSSI the exclusive right of operation for all rail purposes" and that the agreement "prohibited [Port Authority] customers from retrieving or delivering cars to/from BNSF." RSSI further alleged that MMT, with full knowledge of the 2012 Operating Agreement, entered into subsequent agreements with the Port Authority and BNSF Co. in direct disregard of the 2012 Operating Agreement and "deprived RSSI of the benefits of its contract with [the Port Authority]." RSSI petitioned that "[a]t the times MMT entered into [its agreements with the Port Authority], RSSI and [the Port Authority] had *a valid, existing contract that gave RSSI exclusive use* of the [Port Authority] Line for all purposes[.]" (emphasis added). Despite knowledge of the contract, RSSI maintained that "MMT intentionally induced [the Port Authority] to breach *its contractual obligations* to RSSI to avoid the cost and expense of RSSI providing MMT's rail switching needs.... MMT has no justification or excuse for *interfering with the Operating Agreement*[.]" (emphasis added).

RSSI's petition clearly charges MMT with tortious interference for inducing the Port Authority to breach the 2012 Operating Agreement. RSSI did not plead that MMT interfered with RSSI's ongoing business relationship with the Port Authority or any business expectancy it had with the Port Authority. The 2012 Operating Agreement was the sole basis for the rights RSSI claims that MMT violated; RSSI does not allege any facts other than the 2012 Operating Agreement to support a claim for a continuing business expectancy in the exclusive use of the Port Authority Line. Further, RSSI does not allege, even in a conclusory fashion, that it had a

valid business expectancy in the matter or that MMT interfered with its business relationship with the Port Authority. In fact, the term "business expectancy" is found nowhere in the petition. As alleged in RSSI's petition, the only interference that MMT committed was its inducement of the Port Authority to breach its obligations under the void-ab-initio 2012 Operating Agreement, obligations that the Port Authority had no duty to undertake. As noted by Missouri case-law, the distinction between a claim alleging tortious interference with a contract and tortious interference with a business expectancy is real, and not merely a matter of semantics.

Contrary to the arguments raised by RSSI, the distinction between pleading interference with the 2012 Operating Agreement and interference with RSSI's business relationship or expectancy with the Port Authority does matter. The petition specifically identified RSSI's claim against MMT as an interference with a particular contract, and not tortious interference with a more general business expectancy. The petition put MMT on notice that it allegedly interfered with the RSSI's rights under the 2012 Operating Agreement—not that it otherwise interfered with whatever business relationship or expectancy RSSI had, or hoped to have, with the Port Authority. The petition framed the dispute between the parties: the validity of the 2012 Operating Agreement and MMT's purported interference with that agreement. Accordingly, the focus of the proceedings before the trial court was the 2012 Operating Agreement. After the declaratory-judgment action found the underlying contract to be void ab initio, RSSI expanded its claim beyond the framework of its petition

and the trial proceedings, now contending that it had a broader valid business expectancy with the Port Authority. This it cannot do. RSSI specifically designated the 2012 Operating Agreement as its sole basis for recovery, pleading that it had "*a valid, existing contract that gave RSSI exclusive use of the [Port Authority] Line.*" (emphasis added). That contract was determined invalid from the onset. RSSI cannot now introduce a new theory, unsupported by its pleadings, attempting to show it otherwise had a valid business relationship, history, or expectancy in the exclusive use of the Port Authority Line.[15]

In favor of its position, RSSI identifies appellate decisions where the courts have permitted plaintiffs to pursue recovery for claims of tortious interference, even though a contract between the plaintiff and third party was of questionable validity under Section 432.070. Notably, in each of these cases, the plaintiff affirmatively and separately pled the existence of a business expectancy, and that the defendant interfered with *that* business expectancy. In Casterline v. Stuerman, the petition alleged that the plaintiff had been employed in the hospital since May 1974 and that she had been appointed the Assistant Administrator of the nursing home. 588 S.W.2d at 87. Plaintiff further alleged that because of the actions of the defendants, she was dismissed from that employment by the hospital. Id. The parties did not dispute that, between the plaintiff and the hospital, "there existed an employment relationship of indefinite duration which had existed for a fairly substantial period of time prior to her dismissal." Id. at 88. The petition further specifically alleged that the "defen-

---

15. This matter is distinguished from situations where the party has pleaded in its petition *both* a business relationship and a contract to refer to the same pled and recoverable on-going business relationship be-

fore the circuit court. See Clinch, 187 S.W.3d at 13-14. Here, RSSI is deviating from its claim that MMT interfered with the 2012 Operating Agreement.

dants wrongfully interfered with plaintiff's 'relationship and expectations' with her employer." Id. Thus, the court rejected the defendants' argument that, because the plaintiff did not have a written contract, the plaintiff did not have a contract the breach of which they could adduce. Id. Instead, the plaintiff pled and established a continuous expectancy or relationship regarding her employment with the hospital and that the defendants interfered with that continuing relationship. See id.

In Kantel Communication v. Casey, the trial court granted a motion for a J.N.O.V. finding that the plaintiff had not pled or proven the elements of interference with a contract or a business expectancy. 865 S.W.2d at 690. The Kantel court reversed and held that the plaintiff had sufficiently pled a valid business expectancy. Id. In Kantel, the petition contained allegations that plaintiff had "contract expectancies" with a third-party municipal corporation to install telephone equipment. Id. The petition further alleged that agents of the defendants interfered with this planned installation by informing the municipal corporation that the plaintiff would not be able to perform the task as scheduled and that the plaintiff was having financial problems. Id. Thus, the petition asserted that the actions of the defendant's agents induced the municipal corporation to terminate the purported contract and hire the defendant to complete the telephone installation at issue. Id. The plaintiff pleaded a reasonable hope or expectancy of actually installing the telephone-operation systems with the municipal corporation, but for the defendants' interference. See id.

■■■ Here, RSSI pled only a claim for interference with a contract—the 2012 Operating Agreement. RSSI did not allege MMT's interference with any business ex-

pectancy or RSSI's relationship with the Port Authority. Instead, RSSI pleaded and attempted to prove that MMT interfered with the exclusive-use provision of the void-ab-initio 2012 Operating Agreement. Absent the void agreement, RSSI does not plead any interference with its purported rights and business relationship with the Port Authority, or that MMT interfered with any valid expectancy of RSSI in the Port Authority Line. RSSI maintains that its business expectancy is subsumed within the claim for tortious interference with contract, The position is belied by case law recognizing the distinctions of these separate tort claims.

■■ A party cannot simply allege interference with a void-ab-initio contract to successfully plead a claim of tortious-interference. Rhodes Eng'g Co., 128 S.W.3d at 565. The alleged interference with the 2012 Operating Agreement does not automatically establish a claim for interference with a business expectancy, and RSSI here does not identify or delineate any business expectancy in its petition outside of the void 2012 Operating Agreement. See Kantel Commc'ns, 865 S.W.2d at 690 (considering the plaintiff's claim that the defendants interfered with its business expectancies arising out of a purported contract because the plaintiff explicitly pled interference with future economic expectancies); Casterline, 588 S.W.2d at 88 (finding that the defendants interfered with the plaintiff's employment relationship with a third party after the plaintiff expressly pled interference with her expectations and employment relationship). While RSSI might have alleged a business expectancy or relationship in having exclusive use of the railroad—and MMT's knowing interference with *that* business expectancy or relationship—RSSI did not do so.[16]

16. Whether or not RSSI would have succeed-

ed on this claim is another issue. In Rhodes

We hold that, as a matter of law, RSSI cannot establish the existence of a valid contract, and therefore cannot prove a necessary element for its claim of tortious interference with a contract. We further hold that RSSI separately did not plead the existence of a valid business expectancy, which is a required element for a claim for tortious interference with a business expectancy. Accordingly, we deny the entirety of RSSI's Point Two.[17]

### III. Point One—No Material Facts Disputed

■ RSSI posits that summary judgment is inappropriate because there exist many disputed facts regarding the validity of the 2012 Operating Agreement, RSSI's purported business expectancies with the Port Authority, and MMT's improper inducement of the Port Authority's breach of the 2012 Operating Agreement. While certain facts may be in dispute, we are not persuaded that such facts are material to the legal principles which warrant the entry of summary judgment in this case.

#### A. Purported Factual Disputes over the Validity of the 2012 Operating Agreement

As a factual dispute regarding the validity of the contract, RSSI contends that Madison, the Executive Director of the Port Authority, signed the document with the actual authority of the Port Authority's Board. In so doing, RSSI reasons that Madison's authority to enter into the 2012 Operating Argument is evidenced by statements made by Madison that he believed he had the requisite authority, that he contemporaneously informed the Board about the purported agreement, and that the Board never informed him that he lacked the authority to negotiate and contract with RSSI.

Even taken as true, these facts do not undermine the material factual issue underlying the validity of the contract: Did the Board authorize Madison *in writing* to enter into the 2012 Operating Agreement on the Board's behalf? RSSI offers no written authorization establishing Madison's authority to contract with RSSI. Nor does RSSI allege that such a document exists. The summary-judgment evidence before this Court is totally void of any such writing. Instead, RSSI relies on its argument that the Board implicitly sanctioned Madison to act on its behalf.

■ Section 432.070, as stated above, clearly requires that public entities provide written authorization for its agents to enter into binding contracts. Further, equitable remedies such as estoppel are not able to overcome the requirements of Section 432.070, and Section 432.070 must be applied even where it would render harsh results. Ballman v. O'Fallon Fire Prot. Dist., 459 S.W.3d 465, 467-68 (Mo. App. E.D. 2015). While we agree that the timeline of when the Board learned of the existence and the contents of the 2012 Operating Agreement is unclear, RSSI's position that this disputed timeline prevents summary judgment is unavailing. Even had the Board passively acquiesced

---

Engineering Co. v. Public Water Supply District Number 1, the plaintiff specifically pled interference with an invalid contract and expectancies arising *solely* out of the invalid contract, 128 S.W.3d at 565-66. The court found that the plaintiff "could not, as a matter of law, have a reasonable, valid business expectancy alleged to have arisen out of a contract that is unenforceable[.]" Id. at 566; but see Kantel Commc'ns, 865 S.W.2d at 690-91. We need not address this issue because, as stated, RSSI never pled interference with a business expectancy.

17. RSSI also argues in this section that it established that MMT improperly interfered with RSSI's agreement with the Port Authority and that MMT used improper means. Given our holding above, we need not address these arguments.

to Madison's actions, such arguments remain legally insufficient under Section 432.070 to provide Madison the necessary authority to create a binding contract between the Port Authority and RSSI.

Finally, RSSI contends that there is a factual dispute as to whether the Port Authority is a municipal corporation falling under the purview of Section 432.070. RSSI points out that the Port Authority never held itself out as a municipal corporation, its bylaws do not expressly state that it is a municipal corporation, and that there is no evidence indicating that the Port Authority conceptualized itself as a municipal corporation, As discussed above, we recognize that, as a matter of law, the Port Authority is a municipal corporation, regardless of how the Port Authority proclaimed or styled itself.

## B. No Other Remaining Material Factual Disputes

RSSI next contends that there exist factual disputes pertaining to its business relationship with the Port Authority, starting in 2006 and persisting until MMT's improper interference in 2012. As stated above, however, RSSI did not plead MMT's interference with a business expectancy or relationship; rather RSSI limited its claim to MMT's alleged interference with the void 2012 Operating Agreement. Correspondingly, any purported factual disputes as to the nature of RSSI's business relationship and expectancies with the Port Authority outside of the 2012 Operating Agreement are immaterial to RSSI's pleaded claim.

Both parties also dispute the timeline of when MMT was informed about the 2012 Operating Agreement and the essential nature of its terms. RSSI contends that, immediately after MMT expressed interest in building an oil-storage facility on the Port Authority Line, RSSI informed Marquis, the President of MMT, that RSSI was entitled to exclusive use of the Port Authority Line and that RSSI's services were required to transport goods to and from the BNSF Line. In turn, MMT contends that it was not aware of RSSI's agreement with the Port Authority until after MMT entered into both of its agreements with the Port Authority, Again, because the 2012 Operating Argument between the Port Authority and RSSI is void ab initio as a matter of law, and because RSSI does not plead a claim against MMT for tortious interference with RSSI's business relationship or expectancy with the Port Authority, any factual disputes regarding MMT's knowledge of the 2012 agreement simply are not material and do not present any general issue of fact to be determined by the trier of fact. Point denied.

### Conclusion

The judgment of the trial court is affirmed.

Robert G. Dowd, Jr., P.J., concurs.

Sherri B. Sullivan, J., concurs.